THE SPRINGFIELD HOSPITAL *vs.* COMMISSIONER OF
PUBLIC WELFARE
(and four companion cases[1]).

Suffolk.   April 8, 1966. — May 4, 1966.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & SPIEGEL, JJ.

*Hospital.   Public Welfare.*

Local boards of public welfare, in reimbursing hospitals under G. L. c. 118 or c. 118A, §§ 13–32, for care furnished to aid recipients are, in a practical sense, "purchasing" such care from the hospitals, and c. 7, § 30K, limits the obligation of the boards to reimbursement at the "all-inclusive per diem" rates for included services established thereunder, even if those rates are inadequate to reimburse hospitals for the actual cost of the care furnished.   [708–709]

The remedy for any inadequacy of the "all-inclusive per diem" rates for included services to be paid by local boards of public welfare in reimbursing hospitals under G. L. c. 118 or c. 118A, §§ 13–32, for care furnished aid recipients must be sought under c. 7, § 30K, before the Commissioner of Administration, and upon review of his action under c. 30A, § 7; evidence concerning the adequacy of such rates is not relevant in proceedings before the State Department of Public Welfare under c. 118, § 8, and c. 118A, § 21, concerning amounts payable for the care of individual aid recipients, or upon review under c. 30A, § 14, of the department's decisions.   [710–711]

The amount a local board of public welfare should reimburse a hospital for care furnished a recipient of aid under G. L. c. 118A, §§ 13–32, having monthly income but not disqualifying resources, was properly ascertained by applying § 18 to his situation by deducting from his monthly

---

[1] The principal case (No. 6766) is much like the other cases, brought by The Springfield Hospital against the commissioner, viz. No. 6767 (concerning one Giroux, entitled to benefits under the program of "aid to families with dependent children" [AFDC]; see G. L. c. 118), and No. 6768 (concerning one Walas, also an AFDC recipient).   Two cases were brought against the commissioner by Massachusetts General Hospital (MGH), viz. No. 6769 (concerning a Mrs. Passemato, a MAA recipient, who with her husband had income of a total of $258 a month), and No. 6770 (concerning one Lynch, a MAA recipient, who had resources which enabled him to pay something toward his hospital expenses and also had some Blue Cross benefits).   The two cases brought by MGH both involve consideration of G. L. c. 118A, § 18.   The principal issues presented by each of the five cases are essentially the same. For convenience, the principal issues are discussed on the basis of the relatively simple facts in the Early case.   Special considerations affecting some of the companion cases are discussed in part 3 of this opinion.

income the stated monthly sum excluded under that section and thus finding the amount of monthly income available to him to pay the hospital, and subtracting such available amount from the hospital bill as computed at the "all-inclusive per diem" rate for included services established under c. 7, § 30K; a claim by the hospital to reimbursement at the whole of such rate for each day of the recipient's care was not well founded. [711–712]

FIVE PETITIONS for review filed in the Superior Court on October 14, 1963, October 22, 1964, and December 23, 1964.

The petitioners appealed from decrees entered after hearing by *Kalus, J.*

*Colette Manoil (Albert G. Tierney* with her) for the petitioners.

*Nelson I. Crowther, Jr.,* Assistant Attorney General, for the respondent.

CUTTER, J. One Early, a recipient of old age assistance, was eligible for full payment of hospital costs under the program known as "medical assistance for the aged" (MAA). See G. L. c. 118A, §§ 13–32, inserted by St. 1960, c. 781, § 8. He had no resources which could be used to reduce hospital costs. On August 6, 1963, he was admitted to The Springfield Hospital (Springfield). Springfield promptly notified the Chicopee board of public welfare of the admission and received from that local board authorization to send bills directly to it.

Early remained in the hospital for eighteen days, until August 24, 1963. A bill dated August 27, 1963, was sent by Springfield covering (a) hospital care (at $25 a day) in the sum of $450, and also (b) laboratory, X-ray, special drug, and supply charges amounting to $173.50, a total of $623.50. On August 30, 1963, the Chicopee board requested Springfield to bill at the so called "all-inclusive per diem" (AIPD) rate ($23.18 a day for Springfield) mentioned in G. L. c. 7, § 30K, inserted by St. 1953, c. 636, § 2.[2] Chicopee did not pay the bill as submitted.

---

[2] Section 30K, as enacted in 1953, reads, "The director of hospital costs and finances shall determine from time to time and certify to the commissioner of administration, at least as often as annually, the average all-inclusive per diem charge to the general public for public ward accommodations or their equivalent, the all-inclusive per diem cost of care in such accommodations and the all-inclusive per diem cost of care for all patients of each hospital . . .

Springfield appealed under G. L. c. 118A, § 21, to the State Department of Public Welfare, which at first declined to receive the appeal. Later, when directed by mandamus to do so, it heard the appeal. After hearing, payment of $417.24, computed at the AIPD rate, was approved.

Springfield then sought in the Superior Court (under G. L. c. 30A, § 14) judicial review of the department's decision. The trial judge ruled[3] that the Chicopee department was not required to pay for hospital care furnished to Early at more than the AIPD rate, even if that is less than the actual cost of (or Springfield's usual charge for) the services furnished. By final decree, the decision of the State department was affirmed. Springfield appealed.

Springfield's principal, and somewhat diffusely presented, contentions are (a) that to provide "the maximum benefits available to a [r]ecipient" of MAA (c. 118A, §§ 13–32) or of AFDC (G. L. c. 118) requires that the appropriate State or local authorities "meet the actual cost to the [r]ecipient of purchasing his necessary care," in accordance with the recipient's "actual need . . . or the expense in-

---

licensed by the department of public health under . . . [c. 111, § 71]. In determining such all-inclusive charges and costs, charges for and costs of ancillary services shall be included. . . . [Then follow (a) a provision to be applied if the director cannot determine the all inclusive cost of care; (b) provisions concerning the furnishing of data to the director and investigation of costs of the hospitals by the director; and (c) for uniform cost accounting methods.] The commissioner shall certify annually to each of the various departments, boards or commissions of the commonwealth *purchasing* care in such hospitals . . . or reimbursing cities or towns for such care *purchased* by them, such rates with respect to each such hospital . . . as will reflect *reasonable hospital costs or charges* made to the general public, whichever is the lower. All departments, boards or commissions of the commonwealth *purchasing* such service shall pay the rates so certified. The various subdivisions of the commonwealth *purchasing* hospital care and receiving reimbursement therefor, in whole or in part from the commonwealth, shall pay the hospitals . . . for such care at the rates so certified. The commissioner shall also certify at least annually to the department of industrial accidents the all-inclusive per diem cost of care for all patients for each such hospital . . ." (emphasis supplied). Section 30K has been amended, in portions not quoted verbatim above, by St. 1961, c. 586, and St. 1963, c. 439, § 1.

[3] The judge also ruled that the AIPD rate was not established by the State Department of Public Welfare but by the Commissioner of Administration under § 30K, so that no hearing by the State department on the AIPD rates was necessary. The trial judge stated that the record was too meager and ambiguous to make any determinations with respect to the establishment of the AIPD rates by the Commissioner of Administration.

curred by him in obtaining necessary care," and (b) that the liability of a city or town to pay for such care is not limited by G. L. c. 7, § 30K, or by the AIPD rate in effect for a particular hospital. Springfield argues that "the [r]ecipient . . . purchases [necessary] care and not" either the local welfare board or the State department, and that the local board "has the initial responsibility of meeting the [r]ecipient's [full] need."

The commissioner, on the other hand, contends that the right of the hospitals to reimbursement for the expense of caring for any recipients of any form of public assistance is governed by G. L. c. 7, § 30K, and that, within the meaning of § 30K, the local boards and State department, in making such reimbursement, are purchasing hospital care.

1. In *Massachusetts Gen. Hosp.* v. *Cambridge,* 347 Mass. 519, 521 (hereinafter referred to as the *Cambridge* case), we considered the right of a hospital to receive reimbursement from a city for hospital care necessarily incurred by one of its residents in need of public assistance. We held that the right was statutory, and that, under the statutes there applicable, the hospital's recovery from the city was limited (347 Mass. 519, 523) to the expense of care necessarily incurred at the maximum rate established under G. L. c. 7, § 30K. See G. L. c. 117, § 24A, c. 122, § 20.

The *Cambridge* case arose under G. L. c. 117, which provides (see § 1) for public assistance to "poor and indigent" persons, and for "hospital care . . . [to be] furnished to a person in need of public assistance." See § 24A, inserted by St. 1959, c. 584[4]. The present cases arise under somewhat different statutory provisions.

Two cases are based on G. L. c. 118, § 2 (as amended through St. 1962, c. 556, § 1), providing that local boards of public welfare, subject to the supervision and valid regulations of the State department, shall grant aid (AFDC) to certain families with dependent children "sufficient to enable . . . [the] parent to bring up such child or children properly in his . . . own home." The aid is to be paid in

---

[4] Section 24A was later amended by St. 1964, c. 515, effective September 10, 1964, long after Springfield furnished to Early the care here discussed.

cash except that payment for certain expenses, including hospital services, may be made directly to the person or hospital furnishing the services. The other cases involve MAA payments authorized by G. L. c. 118A, §§ 13–32, under which, among other items, see § 13 (e) (1), the cost of "inpatient hospital ward services" is paid to the institution furnishing such services (see § 14) in behalf of qualified recipients. The present programs under these statutes (see e.g. c. 118, § 7, and c. 118A, § 25) have been in part adopted to permit Massachusetts to receive the benefit of grants under relevant Federal programs. See *Massachusetts Gen. Hosp.* v. *Commissioner of Pub. Welfare,* 347 Mass. 24, 25, fn. 1.

Springfield argues that the Federal statutes contemplate that the money obtained from Federal grants shall be used for aid furnished to individuals, in accordance with a generous estimate of such individuals' need, and that each of these individual recipients of aid in effect makes a contract with the hospital furnishing services which is binding on the individual and must be paid for by the local board in accordance with Springfield's fair and reasonable charges. Doubtless, the care furnished to eligible recipients and the payments to those giving that care are intended to be fully adequate. We perceive nothing, however, in the Massachusetts statutes governing these special types of assistance (MAA and AFDC), which establishes that the Legislature intended hospital services to such aid recipients be provided and paid for under c. 118 and c. 118A in a manner different from the method applicable to similar services (to welfare recipients and certain others) under c. 117.

The whole structure of these chapters shows that the local boards of public welfare, under the general supervision (see c. 118, § 5; c. 118A, § 20) of the State department, were to reimburse the hospitals (see c. 118, § 2; c. 118A, § 14) for aid furnished. In a practical sense, the local boards are providing the aid recipients with hospital care by "purchasing" that care from the hospitals, and we interpret c. 7, § 30K, as limiting the obligation of the local boards to making payments at the AIPD rate for included

services. Cf. *Massachusetts Gen. Hosp.* v. *Commissioner of Pub. Welfare,* 347 Mass. 24, 28 (discussing certain non-included nursing services).

2. Springfield further contends that the AIPD rate set for it for 1963 was not adequate or properly compensatory in various respects.[5] Obviously, if the AIPD rates are inadequate, this is a matter of serious concern to the hospitals. We think, however, that they have no remedy in this proceeding.

Section 30K provides a convenient, simple method of computing "fair and just" compensation to hospitals furnishing care to aid recipients under G. L. cc. 117, 118, 118A, and 118D (disabled persons). See 1953 House Doc. No. 2400, pp. 23–24, 26. Because of the obvious difficulties of determining in each case the appropriate charge for the particular hospital services rendered, the all inclusive per diem rate has been developed. In effect, by § 30K, the Commissioner of Administration has been directed to perform a function much like that of the Commissioner of Insurance in fixing "adequate, just, reasonable, and nondiscriminatory" charges under G. L. c. 175, § 113B (as amended through St. 1964, c. 391), and that of the Department of Public Utilities in approving various utility rates. See G. L. c. 164, § 94, as amended through St. 1963, c. 615, § 1.

Nonprofit hospitals have not been made public utilities, although they resemble utilities in that they conduct enterprises greatly affected with a general public interest and are subject to State regulation. Even if, as in the *Cambridge* case, 347 Mass. 519, 522, a hospital may not be

---

[5] There was evidence (1) that the 1963 AIPD rate was based upon the lower costs for a twelve months period ended fifteen months prior to January 1, 1963, thus causing serious financial losses to Springfield in a period of rapidly rising costs; (2) that Springfield, to offset operating losses largely incurred in caring for welfare patients at an inadequate AIPD rate, has been obliged to use substantial amounts of its unrestricted endowment income to meet operating costs; (3) that funding by Springfield of depreciation (and of reserves for hospital plant expansion and replacement) has not been possible because of the losses; and (4) that, over the period 1952–1963, the per diem expenses of welfare patients to the hospital (and also the per diem charges to paying patients) had in each year very greatly exceeded the welfare per diem reimbursement at the AIPD rate.

"legally obliged to . . . care for" particular patients, as a practical matter such charitable hospitals, established for the benefit of the public generally, do have a strong civic obligation[6] to serve sick persons without discrimination within the range of their resources, facilities, and usually offered services. The statutes, authorizing public payment for hospital care of aid recipients, in effect recognize this and rely upon the probability that much of such care will be furnished by private charitable hospitals. Indeed, it may be that the statutory programs could not be carried out[7] without such hospitals' coöperation in receiving a large volume of welfare patients.

In any event, without regard to whether hospitals are utilities or are legally obliged to care for welfare patients, § 30K is the statutory method provided to ensure their receipt of adequate compensation from public funds when they do furnish such care. It is not now necessary to determine whether the standards of fixing AIPD rates set by § 30K (see fn. 2) are valid and nonconfiscatory, or how they shall be interpreted. Cf. *Massachusetts Bonding & Ins. Co.* v. *Commissioner of Ins.* 329 Mass. 265, 270. We decide only (a) that the remedy for any inadequacy of the AIPD rates (including any constitutional relief concerning those rates) must be sought under § 30K before the Commissioner of Administration, and upon review of his action under c. 30A, § 7; and (b) that evidence concerning the adequacy of the AIPD rates (although appropriate in proceedings under § 30K) is not relevant in proceedings before the State Department of Public Welfare under G. L. c. 118, § 8, and c. 118A, § 21, concerning amounts payable for the care of individual aid patients, or upon review under c. 30A, § 14, from the department's decision. As we said of the hospital in the *Cambridge* case, 347 Mass. 519, 522, Springfield in

---

[6] This obligation in some instances may be reinforced by the requirements of Federal grants. See *Simkins* v. *Moses H. Cone Memorial Hosp.* 323 F. 2d 959 (4th Cir.), cert. den. 376 U. S. 938.

[7] For example, the evidence showed that Chicopee has no hospitals. Its welfare board uses hospitals in surrounding cities. The Chicopee board's director testified that he doubted "if any hospital could properly deny service to a person in need of . . . medical care. That would be unlikely to happen."

these appeals, "may not make a collateral attack upon the reasonableness of" its 1963 AIPD rate.

3. The two cases (fn. 1) brought by MGH raise questions concerning the income resources of aid recipients under the MAA program and the effect of those resources upon the hospital's claim to the whole AIPD rate for each day of the recipient's care. The governing statute is G. L. c. 118A, § 18, inserted by St. 1960, c. 781, § 8.[8]

In the Lynch case, the patient was a single male. He had monthly income of $181.02. From this in computing the amount of Lynch's need, and thus of the MAA help to be given, the exclusion of $150 (see language of clause [a] in fn. 8 following point [X]) was deducted, leaving a total of $31.02 of income available to Lynch with which to pay MGH in part for his care. The total bill at the AIPD rate was $530.27. Of this Blue Cross paid $401.96. From the balance of $128.31, was deducted $31.02, leaving a balance to be paid by the local board in Somerville where Lynch lived. The State department ordered the local board to pay this sum and the final decree in the Superior Court, upon MGH's petition for review, affirmed the department's decision.

In the Passemato case, the patient was a wife residing in Everett. She was cared for by MGH for one day. The AIPD rate was $35.66. Although the State department concluded that the Everett board had no liability to grant any MAA help, the trial judge in the Superior Court (upon

---

[8] Section 18, as originally inserted, reads in part, "A person entitled to . . . [MAA] shall receive such assistance on the basis of need. The amount of such need shall be determined, in accordance with standards approved by the department, after consideration of the degree to which an applicant's income and resources are insufficient to meet the costs of necessary medical care. In determining such income, where a person has need of a residence apart from a licensed chronic hospital, licensed nursing home or public medical institution, [X] there shall be excluded (a) if unmarried or if married and the applicant is the husband, income of applicant of one hundred and fifty dollars a month, and (b) if married, and the applicant is the wife, combined income of husband and wife of two hundred and twenty-five dollars a month." Then follow provisions, not here relevant, concerning complete disqualification of persons from the receipt of MAA help by reason of the possession of stated amounts of property. The letter [X] in the quotation from § 18 is inserted for convenience in referring to the language immediately following. Section 18 was later amended by St. 1964, c. 591, and St. 1965, c. 657, § 1, but the amendments are not applicable to these cases.

review under c. 30A, § 14) recomputed the amount owed in accordance with c. 118A, § 18 (see fn. 8). The combined income of husband and wife was $258. The amount of excluded income ($225) (fn. 8, language in clause [b] following point [X]) was deducted leaving $33 available to the husband toward paying the wife's hospital bill. After deducting this $33 from the amount due to the hospital for one day at the AIPD rate ($35.66) there remained $2.66 to be paid to MGH by the Everett board. The final decree ordered this payment to be made.

The final decrees correctly reflect the application of the terms of § 18 to the facts. As in the cases brought by Springfield, no question concerning the adequacy of the AIPD rate may be considered in these proceedings.

5.  In each of the five cases, the final decree is affirmed.

*So ordered.*