MURPHY NURSING HOME, INC., & others[1] *vs.*
RATE SETTING COMMISSION & others[2]
(and a companion case[3]).

Suffolk.    October 2, 1973. — December 27, 1973.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Nursing Home. Regulation. Constitutional Law,* Due process of law. *Equity Jurisdiction,* Declaratory relief.

A suit in equity brought by a number of nursing homes for judicial review of regulations established by the Rate Setting Commission concerning payment by the State for publicly aided patients, and to challenge the constitutionality of a "rate freeze" provided for in St. 1969, c. 800, § 6, was properly before the court under G. L. c. 30A, § 7, and c. 231A. [457-458]

Where the Rate Setting Commission in January, 1969, set tentative rates for 1969 for public patients in nursing homes pending the availability of reliable cost data, and notified the nursing homes that the rates were tentative, the commission's subsequent redetermination of rates retroactive to January 1, 1969, was constitutional and was proper even though G. L. c. 30, § 5, stated that regulations become effective upon filing. [458-459]

A "rate freeze" on fees paid by the State to all Medicaid vendors under St. 1969, c. 800, § 6, was neither discriminatory nor confiscatory, where the Rate Setting Commission, defining "Medicaid vendors" under G. L. c. 118E, § 6, applied the "freeze" only to "skilled nursing homes" and not to "unskilled nursing homes," and where the nursing homes were not legally compelled to accept publicly aided patients. [459-462]

G. L. c. 7, § 30L, contemplates "fair and reasonable rates of payment" by governmental units to providers of health services, not "fair and reasonable cost reimbursement," and, while nursing home costs are one factor in determining rates, the interest of the taxpayers in avoiding exorbitant expenditures is another factor. [462]

---

[1]Fairmount Nursing Home, Inc., Clark Manor Nursing Home Corp., and Adams Nursing Home of Williamstown, Inc.

[2]Commissioner of Public Welfare and Attorney General.

[3]Daniels Nursing Home, Inc., Francis Manor Nursing Home, Inc., Deering Nursing Home, Inc., and Quentin M. Gehlin *vs.* Rate Setting Commission and Attorney General.

Murphy Nursing Home, Inc. *v.* Rate Setting Commission.

The following paragraphs of the 1969 Regulations of the Rate Setting Commission as construed by it provided proper formulas for calculating "fair and reasonable rates of payment" to nursing homes under G. L. c. 7, § 30L [462-463]:

Paragraph 4, which provided that a per diem rate of reimbursement be computed by dividing a cost figure "by actual patient day census or 90% . . . of total bed capacity, whichever is the greater," where, although new nursing homes had smaller licensed bed capacities than actual bed capacities, the commission excluded unlicensed beds in making its calculations; [463-464]

Paragraph 4 (A) (1) and 4 (D), which provided that one figure used in computing the per diem rate be an "allowance in lieu of Owners, Officers, Administrators Salaries and Management Fees" based on 100% of "total bed capacity" rather than the 95% figure used in 1968, and that no person in the "allowance" category be "allowed any additional . . . compensation regardless of other services performed," where the commission interpreted the regulations as permitting compensation to a second owner, officer, or administrator who performed certain services, and where the per diem rate, regardless of the method used to compute it, was similar to the per diem rate of 1968 because the commission added a 5% cost of living increase; [464-465]

Paragraph 4 (E), which provided for a 9% return on equity capital, even though the amount of equity capital was based on a computation assuming 100% occupancy while the average rate of occupancy was 94%; even though the regulations did not expressly make exceptions for homes where the amount of equity capital would appear lower because of use of accelerated methods of depreciation; and even though the 9% rate did not take into account corporate income taxes or lower risks and higher rates of return in other industries; [465-468]

Paragraph 8 (b), which provided that a depreciation allowance used in computing equity capital would be based on stated dollar amounts per bed if a change of ownership occurred after 1966 and would be based on construction or acquisition costs if construction occurred in 1968 or 1969, although there had been since 1966 active trading in nursing homes at much higher prices than the amounts set forth in the regulation, where such higher prices were due partly to expectations concerning future rates of reimbursement; [468-469]

Paragraphs 8 (c) and 8 (d), which included in reimbursable costs legal, accounting, and auditing fees except fees for services in connection with rate appeals to the commission; [469]

Paragraph 8 (f), which provided that educational expenses incurred by the homes would be reimbursed only up to 50% of the total costs incurred for non-owner employees; [469]

Paragraph 8 (h), which provided for reimbursement to the homes for a uniform 75% of premium costs for certain coverages of group life, accident, dismemberment, and health insurance for home employees, even though the actual percentages paid by the homes for such insurance varied. [469-470]

BILLS IN EQUITY filed in the Supreme Judicial Court for the county of Suffolk on July 30, 1969, and September 3, 1969.

The cases were reserved and reported without decision by *Braucher, J.*

*Evan Y. Semerjian* for Murphy Nursing Home, Inc., & others.

*David L. Whitney* for Daniels Nursing Home, Inc., & others.

*Timothy F. O'Leary,* Special Assistant Attorney General, for the Rate Setting Commission.

BRAUCHER, J. These cases, brought by a number of nursing homes, call for judicial review of the rules and regulations (the 1969 Regulations) established by the Rate Setting Commission (commission) on June 25, 1969, to govern the reimbursement of nursing homes for the care of publicly aided patients. The plaintiffs also challenge the constitutionality of the legislative "rate freeze" provided for in St. 1969, c. 800, § 6. We hold that the 1969 Regulations constitute a valid exercise of the authority of the commission and that the rate freeze is not unconstitutional either on its face or as applied.

Both cases began before a single justice in the county court as bills for declaratory relief under G. L. c. 30A, § 7, and G. L. c. 231A. They were referred to a master on October 28, 1969, by a single justice of this court. The master's report was confirmed by consent on November 15, 1972, and on January 25, 1973, a single justice reported the cases for determination by the full court on the pleadings, the master's report, the stipulations of the parties and the exhibits.

We summarize the setting as it appears from the master's report. Facts relating to particular issues will be stated in connection with our discussion of those issues. For a period of approximately ten years, ending in 1968, nursing homes were reimbursed by the Commonwealth for publicly aided patients on a single Statewide flat rate intended to cover all costs plus an element of profit. On January 5, 1968, the Board of Rate Setting, predecessor of the commission, adopted rules and regulations (the 1968 Regulations) for the determination of rates of payment to convalescent and nurs-

ing homes for 1968. On June 25, 1969, the commission adopted the 1969 Regulations, effective retroactively to January 1, 1969. The cost reimbursement system reflected in the 1969 Regulations was first adopted in the 1968 Regulations.

There are over 25,000 publicly aided patients in nursing homes in Massachusetts, representing 80% of all patients in nursing homes. The Department of Public Health licenses nursing homes by twenty-bed segments, and it generally takes six to nine months for a new nursing home to become fully licensed. The average annual rate of occupancy of nursing homes in full operation is approximately 94% of licensed capacity, and 100% occupancy is virtually impossible to achieve. Use of the 1969 Regulations to compute rates of reimbursement would result in a saving to the Commonwealth of approximately $4,000,000 as compared with use of the 1968 Regulations.

The governing statute, G. L. c. 7, § 30L, as appearing in St. 1968, c. 492, § 3 (later amended by St. 1970, c. 714), provides that the commission "shall have the sole responsibility for establishing fair and reasonable rates of payment to be used by governmental units . . . and for establishing fair and reasonable charges to be used by state institutions for general health supplies, care, services and accommodations." It is to "determine . . . the rates to be paid by each governmental unit to providers of health services . . .. Each rate established by the commission shall be deemed a regulation and shall be reviewable as hereinafter provided. The commission shall promulgate rules and regulations for the administration of its duties and the determination of rates as herein required subject to the procedures prescribed by chapter thirty A."

1. *Procedure.* These cases are properly before us under G. L. c. 30A, § 7, and c. 231A. *Massachusetts Gen. Hosp.* v. *Rate Setting Commn.* 359 Mass. 157, 163-166 (1971). Compare the procedure under the predecessor statute, G. L. c. 7, § 30L, as appearing in St. 1963, c. 809, § 1. *Palm Manor Nursing Home, Inc.* v. *Rate Setting Commn.* 359 Mass. 652,

654-655 (1971), and cases cited. The fact that more than four years have elapsed since the cases began suggests that some better mode of proceeding could be found. Commonly cases involving the trial of contested issues of fact are transferred by the single justice to the Superior Court under G. L. c. 211, § 4A. The present cases were instead referred to a master. Evidentiary hearings before the master extended only eleven days and ended in June, 1970. Much of the delay was occasioned by illnesses of one of the stenographers and of counsel and by proceedings subsequent to the filing of the master's report. Nevertheless, the cases, while not as protracted as some, illustrate the fact that ultimate disposition is often delayed rather than accelerated by reference to a master. See *O'Brien* v. *Dwight,* 363 Mass. 256, 279-280 (1973).

2. *Retroactivity.* The 1968 Regulations provided (par. 14) that the permanent 1968 rate for each nursing home would continue in effect in 1969 until a new permanent rate was established for 1969. Statute 1968, c. 492, § 25, effective September 12, 1968, provided that all rates, classifications and other regulations then in effect should remain in effect "until superseded or repealed by the rate setting commission in accordance with law." On January 6, 1969, the commission established "tentative rates" pursuant to the 1968 Regulations and so notified the plaintiffs and all other nursing homes by a form letter which concluded, "The permanent 1969 rate shall be made retroactive to January 1, 1969." The 1969 Regulations, promulgated June 25, 1969, provided explicitly (par. 1) that 1969 rates "will be retroactive to January 1, 1969."

The plaintiffs in the companion case contend that the retroactive feature of the 1969 Regulations was not "in accordance with law" because under G. L. c. 30A, § 5, inserted by St. 1954, c. 681, § 1 (before the effective date of St. 1969, c. 808, § 5), regulations were to be filed with the Secretary of State and became effective "upon filing, unless a *later* date is required by any law or is specified by the agency in the regulation" (emphasis supplied). They contend

that the result was to confiscate their property, citing *Campbell* v. *Boston,* 290 Mass. 427, 430 (1935), and *Bernhardt* v. *Atlantic Fin. Corp.* 311 Mass. 183, 191 (1942).

We reject these contentions. Before the 1969 amendment, G. L. c. 30A, § 5, required that regulations be filed with the Secretary of State, and until properly filed the regulations were not effective. *Kneeland Liquor, Inc.* v. *Alcoholic Beverages Control Commn.* 345 Mass. 228, 235 (1962). *Massachusetts Gen. Hosp.* v. *Commissioner of Pub. Welfare,* 346 Mass. 739, 740 (1964). But in a proper case a regulation could be filed to redetermine rates for past transactions. *Massachusetts Gen. Hosp.* v. *Cambridge,* 347 Mass. 519, 522-524 (1964). A case where tentative rates have been set pending the availability of reliable cost data is such a proper case. *Employers' Commercial Union Ins. Co.* v. *Commissioner of Ins.* 362 Mass. 34, 39-40 (1972). See *Massachusetts Gen. Hosp.* v. *Commissioner of Admn.* 353 Mass. 369, 374 (1967). The Constitution of the United States interposes no barrier to retroactive redetermination of provisional or tentative rates. *Great No. Ry.* v. *Sunburst Oil & Ref. Co.* 287 U.S. 358, 362 (1932).

3. *The rate freeze.* Statute 1969, c. 800, § 6, effective November 22, 1969, provided that "the fee schedules in effect on January 1, 1969, for medical care and assistance provided under the state [Medicaid] plan . . . shall continue in effect until June 30, 1970, insofar as such action does not violate federal law." On September 11, 1969, the commission sent the Commissioner of Public Welfare a letter interpreting the "section 6 rate freeze" as intended "to apply to all Medicaid vendors," and to prescribe payment "in accordance with the fee schedules prescribing payment for the same or comparable services if rendered on January 1, 1969." Under G. L. c. 118E, § 6, inserted by St. 1969, c. 800, § 1, Medicaid vendors included hospitals furnishing inpatient services and "skilled nursing homes," but not unskilled nursing homes (also called "intermediate care facilities"). On October 31, 1969, the United States Department of Health, Education and Welfare (HEW) determined that the

rate freeze was invalid with respect to inpatient health services. See *Catholic Medical Center of Brooklyn & Queens, Inc.* v. *Rockefeller,* 305 F. Supp. 1268 (E. D. N. Y. 1969), affd. 430 F. 2d 1297 (2d Cir. 1970), app. dism. sub nom. *Rockefeller* v. *Catholic Medical Center of Brooklyn & Queens, Inc.* 400 U. S. 931, holding invalid with respect to inpatient hospital services a similar rate freeze in New York. The commission then instructed the Commissioner of Public Welfare not to apply the rate freeze to inpatient hospital services, but to continue to apply it to skilled nursing homes. HEW approved the change on December 12, 1969.

The master found that a home which employs a full time registered nurse for forty hours a week as director of nurses qualifies as a "skilled nursing home," and that one which does not is classified as an unskilled nursing home. Both types of nursing homes must be licensed by the Department of Public Health, and both receive reimbursement for publicly aided patients. There was no evidence to explain or support the distinction between skilled and unskilled nursing homes in the application of the rate freeze, but there was no evidence on which he could conclude that the distinction was irrational or improperly discriminatory.

We hold that the commission correctly interpreted the rate freeze statute. Although, as the plaintiffs contend, "fee schedules" is not an apt term to describe the rates established for nursing homes, another section of the same statute shows that the term was used to include all types of payment to providers of services under the Medicaid program. G. L. c. 118E, § 18 (3), inserted by St. 1969, c. 800, § 1. The rate freeze applied to all Medicaid vendors, but only to payment for services under the Medicaid plan. Skilled nursing homes provided such services; unskilled nursing homes did not, although they did provide services reimbursed pursuant to old age assistance (G. L. c. 118A), disability assistance (G. L. c. 118D), and aid to the blind (G. L. c. 6, §§ 129-150). The effect of the rate freeze was to subject the rates for Medicaid services rendered from November 22, 1969, to June 30, 1970, to the rates for comparable services rendered on January 1,

1969. Thus the frozen rates, like the rates for January 1, 1969, were determined by the 1969 Regulations, subject to judicial review under G. L. c. 30A, § 7.

This interpretation of the rate freeze statute disposes of the plaintiffs' claim that the rate freeze was irrational, discriminatory and confiscatory, and hence unconstitutional under *Hall-Omar Baking Co.* v. *Commissioner of Labor & Indus.* 344 Mass. 695, 707-709 (1962), *Coffee-Rich, Inc.* v. *Commissioner of Pub. Health,* 348 Mass. 414, 425-426 (1965), *Aetna Cas. & Sur. Co.* v. *Commissioner of Ins.* 358 Mass. 272, 280-281 (1970), and *Travelers Indem. Co.* v. *Commissioner of Ins.* 358 Mass. 387, 389 (1970). Unskilled nursing homes were excluded from the rate freeze because they were not eligible to render services under the Medicaid program, to which the rate freeze was limited. Inpatient hospital services were excluded from the rate freeze because their inclusion would have violated Federal law, as interpreted by HEW and the Federal courts. Skilled nursing homes, like other Medicaid providers apart from inpatient hospital services, remained subject to the rate freeze. St. 1969, c. 800, § 10. The distinctions drawn were neither irrational nor improperly discriminatory.

As for confiscation, we have said: "The right of a hospital to recover from a city or town for care furnished to a person in need of public assistance is purely the creature of statute and the Legislature could limit the right as it saw fit. No constitutional question is involved. If, as was not the case, the hospital had been legally obliged to receive and care for the patients a different question would be presented." *Massachusetts Gen. Hosp.* v. *Cambridge,* 347 Mass. 519, 522 (1964). The same principle applies to State reimbursement of nursing homes not legally required to care for publicly aided patients. The plaintiffs contend that a different rule applies because the Commonwealth had established a cost reimbursement system. They had relied on that system, they say, and it was unfair to supersede it retroactively and to do away with it until June 30, 1970. As we interpret the rate freeze statute, however, it did not interfere with the judicial review

of the 1969 Regulations already in process. The statute continued in effect the "fair and reasonable rates of payment" for January 1, 1969, established under those regulations, as they might be revised by reason of judicial review. Thus the effect of the rate freeze was merely to foreclose administrative revision of those rates for a period of a little more than seven months, from November 22, 1969, to June 30, 1970. That was hardly confiscation.

4. *The 1969 Regulations.* The plaintiffs attack seven specific provisions of the 1969 Regulations "for failure to provide fair and reasonable cost reimbursement." We think the quoted language is misleading. The statute calls for "fair and reasonable rates of payment" by governmental units to providers of health services. G. L. c. 7, § 30L, as appearing in St. 1968, c. 492, § 3. The rate for any particular provider is to be "adequate, fair and reasonable as to such provider based, *among other things,* on the costs of such provider" (emphasis added). G. L. c. 7, § 30*O,* as appearing in St. 1968, c. 492, § 3. The rates for particular providers are not in issue in these cases. See *Massachusetts Gen. Hosp.* v. *Rate Setting Commn.* 359 Mass. 157, 163-166 (1971). Even as to a particular provider, the statute does not mandate reimbursement of all fair and reasonable costs. See *Cabot Nursing Home, Inc.* v. *Rate Setting Commn.* 359 Mass. 686, 690-691 (1971). Nursing homes are not public utilities. Unlike many hospitals, they are typically run for profit. Compare *Springfield Hosp.* v. *Commissioner of Pub. Welfare,* 350 Mass. 704, 709-710 (1966). They are subject to competitive pressures: the master found that the 80% occupancy rate of one of the plaintiffs for 1969 constituted a reduction caused by competition from another nursing home. Against the interests of publicly aided patients in the adequacy of facilities and services and the interests of nursing homes in making a profit, the commission must balance the interests of the Commonwealth and its taxpayers in avoiding exorbitant expenditures.

There is in this case no finding like that in some of our insurance rate cases, that there was a large aggregate loss to

the entire industry for the preceding year and a probable greater loss for the year in issue. See *Insurance Rating Bd.* v. *Commissioner of Ins.* 359 Mass. 111, 115 (1971). The master concluded that the allowance for a return on equity capital was unfair and unreasonable, but he reported that there was no evidence that the rate of return encouraged or discouraged new nursing home construction or operation or prompted existing owners or operators to leave the business. The plaintiffs contend that the regulations in some respects take double or even triple precautions against paying for private patients or for empty beds. There is force in that contention, but in the absence of evidence as to overall impact, it falls short of a showing that the regulations necessarily result in rates that are not "fair and reasonable." The plaintiffs have the burden of making such a showing. *Palm Manor Nursing Home, Inc.* v. *Rate Setting Commn.* 359 Mass. 652, 656 (1971). *Cabot Nursing Home, Inc.* v. *Rate Setting Commn.* 359 Mass. 686, 688 (1971).

In the light of these general considerations, we turn to the specific attacks on the 1969 Regulations.

5. *Total bed capacity.* Under par. 4 of the 1969 Regulations, a per diem rate of reimbursement for each individual home is to be computed by dividing a cost figure "by actual patient day census or 90% . . . of total bed capacity, whichever is the greater." Especially in the case of a new home, the master found, there may be a substantial difference between licensed bed capacity and total bed capacity. As applied to a new home, a per diem rate based on total bed capacity will result in reimbursement less than actual recognizable costs and expenses, and the regulations are unfair and unreasonable in allowing for such a result. He also found that it is not clear whether the commission has a policy of construing licensed and total bed capacity as synonymous, but that there is no basis in the regulations for such a policy and that such a policy "does not make the clear contrary provisions of paragraph 4 fair and reasonable."

The plaintiffs stand on the master's findings and conclusions. The commission did not brief the point, but asserted

in oral argument that it was proper for it to interpret its regulations to avoid unfairness in the treatment of new nursing homes. In *Palm Manor Nursing Home, Inc.* v. *Rate Setting Commn.* 359 Mass. 652, 656-657 (1971), we upheld the application of the commission's 1967 Regulations to a new nursing home, on a finding that a rate based on cost would be unrealistic when applied to a home operating at less than one-third capacity. Nevertheless, we think it was open to the commission to read "total bed capacity" in its 1969 Regulations to exclude beds which could not lawfully be used. Alternatively, it could exclude unlicensed beds to the extent necessary to avoid unfairness and a serious challenge to the validity of the regulations. Either way, the regulations have not been shown to be invalid. As to new nursing homes constructed during 1968 and 1969, moreover, par. 6 of the 1969 Regulations requires temporary rates based on the regulations only "as far as practical."

6. *Salaries and fees.* Paragraphs 4 (A) (1) and 4 (D) of the 1969 Regulations provide as one component of the cost figure used in computing the per diem rate, an "Allowance in Lieu of Owners, Officers, Administrators Salaries and Management Fees," to be determined from Schedule I on the basis of 100% of "total bed capacity." Paragraph 4 (D) further provides: "No person included in this category will be allowed any additional salary or compensation regardless of other services performed." Compare the different provision of par. 6 of the 1968 Regulations referred to in *Cabot Nursing Home, Inc.* v. *Rate Setting Commn.* 359 Mass. 686, 690 (1971).

The master found that in adopting Schedule I the commission added a 5% cost of living increase to the similar schedule in the 1968 Regulations but changed from a determination based on 95% occupancy to one based on 100% occupancy; the result was no substantial change. He also found that no significant effort was made to determine on a current basis the reasonableness of the amounts. In practice, he found, if a second owner, officer or administrator performs services such as nursing, bookkeeping and house-

keeping, the commission allows compensation for those services in computing the rate. He concluded that if the schedule results in fair and reasonable compensation, this is more by accident than design, that there was no reasonable basis for using a 100% occupancy rate, and that the results of applying the schedule to one-owner and more than one-owner homes are in some instances contrary to the regulations and in others without rational basis.

There was no finding that the schedule provides for compensation lower than what is fair. There was testimony that the 1969 schedule was arrived at by adding 5% to the 1968 schedule, but no testimony as to how the 1968 schedule was determined. For a 100-bed home, whatever its rate of occupancy, the 1969 schedule yields an allowance of $15,225 or $152.25 per patient, or about 42¢ per patient day in the per diem rate. The 1968 schedule would have yielded $14,500, or, if the actual rate of occupancy was less than 95%, $152.63 per patient, or about 42¢ per patient day. This computation demonstrates that the cost of living increase was illusory, but it falls short of a demonstration that the resulting rates were unfair or unreasonable.

On its face, the schedule looks like a schedule of single salaries for administrators rather than a schedule of aggregate amounts for several persons performing administrative services. Although pars. 4 (A) (1) and 4 (D) can be read as applying the schedule to the aggregate of all owners, officers and administrators, the commission apparently reads them to permit additional compensation for administrative services where a second owner performs such services. The regulation is sufficiently ambiguous to permit the commission's reading, and it is not invalid when so read. Nor is it fatal that the owner of one nursing home may work both there and in a second home; in such cases the scheduled allowance applies to his compensation in his own home but not in the second home.

7. *Return on equity capital.* Paragraph 4 (E) of the 1969 Regulations provides for an allowance of 9% for return on equity capital, computed on the basis of 100% occupancy of

total bed capacity. Paragraph 8 (e) defines equity capital, with immaterial exceptions, as assets less liabilities as determined by the balance sheet submitted annually by each nursing home. The master concluded that these provisions were unfair and unreasonable in (a) basing the computation on 100% occupancy, (b) failing to allow an adjustment for a nursing home which had used accelerated depreciation for other purposes, and (c) failing to take into account either corporate income taxes or relative risks and rates of return in other industries.

The objection to computation based on 100% occupancy relates in part to the difference between licensed bed capacity and total bed capacity, discussed under point 5 above. The master found that, in computing the 9% return on equity for new homes, it was the policy of the commission to consider licensed bed capacity as the equivalent of total bed capacity, but he found nothing in the regulations to support the policy. For the reasons stated under point 5, these findings do not show the regulation to be invalid. The objection also rests on the fact that 100% occupancy is virtually impossible to attain, average occupancy being 94%. This means only that for the average nursing home the allowance for return on equity is 8.46% instead of 9%. See the discussion of the impact of income taxes, below.

The master found that most Massachusetts nursing homes use straight-line depreciation for all purposes. But, he found, a nursing home which in prior years used accelerated depreciation would receive a smaller allowance for return on equity than an identical home which used straight-line depreciation. The commission would allow recalculation to straight-line depreciation in such cases, but nothing in the regulations authorized such a recalculation, and nursing home operators were not aware of the commission's position until the hearings before the master. This objection, like the related objection that no return on equity is allowed for fully depreciated assets, seems to ignore par. 8 (b) providing for a depreciation allowance ''based on accepted accounting principles'' and ''the straight line method of calculation.'' Ac-

cepted accounting principles allow the recovery of the cost of an asset through depreciation, but they do not allow that cost to be so recovered twice, and they require that the book value of the asset be reduced by an amount equal to depreciation expense. The commission, it seems to us, followed its regulations faithfully in allowing recalculation of depreciation taken for purposes other than rate purposes, and the regulations were fair and reasonable in these respects. See Priest, Principles of Public Utility Regulation, 112-138, 172 (1969); Phillips, The Economics of Regulation, 191-206, 244-251 (1965); Bauer, Updating Public Utility Regulation, 4-10, 77-78 (1966). Cf. *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 360 Mass. 443, 477-478 (1971).

The 9% rate of return is computed without provision for corporate income taxes and, the master found, is equivalent to about 4% to 7% after such taxes. The rate was based on a rate published by the Social Security Administration in connection with Medicare programs. There was no meaningful independent analysis or investigation, on a comparative basis or otherwise, of its fairness and reasonableness as applied to Massachusetts nursing homes. It is about half the average return to utility companies in the country, and the risk to capital is greater in the nursing home industry than in the public utility industry. The 9% rate is slightly less than half the average rates of return for corporations other than utilities and financial institutions.

In the absence of evidence of the overall impact of the 1969 Regulations, these findings do not show that the regulations are inconsistent with the commission's responsibility to establish "fair and reasonable rates of payment." We are not even told how the rates set by the commission compare with those charged to private patients. The plaintiffs seek a system of government contracting based on 100% of all "fair and reasonable costs," plus 11%, after taxes, on invested capital. Cf. *Boston Gas. Co.* v. *Department of Pub. Util.* 359 Mass. 292, 302-306 (1971); *New England Tel. & Tel. Co.* v. *Department of Pub. Util., supra,* at 471-478. A system of full cost reimbursement, even if costs are closely

supervised, may eliminate incentives to efficient operation and lead to wasteful cost increases. See Paul, United States Government Contracts & Subcontracts, 86-87 (1964); Staley, Incentive Contracting: Government Point of View, Southwestern Legal Foundation, Government Contracts and Procurement, 1, 7-9, 28-30 (1964). A member of the commission testified, for example, to the possibility that two owners of separate nursing homes could arrange to perform services in each other's homes, avoiding the limitations on allowances for services by owners. In view of such possibilities, we do not find it unreasonable to limit the return on capital to a rate less than is allowed to closely regulated monopolies and less than is expected in unregulated private industry.

8. *Depreciation.* Paragraph 8 (b) of the 1969 Regulations provides for an allowance for depreciation based on original acquisition cost, with stated useful lives, and on the straight-line method of calculation. Where there has been a change of ownership after 1966, however, depreciation allowances are based on stated dollar amounts per bed or, where actual construction took place in 1968 or 1969, limited to construction or acquisition costs. The figures, the master found, were arrived at by taking average construction and equipment costs for the years 1960 through 1967 and applying correction factors for replacement costs in 1969. The limitations were a reaction to the high capital cost of homes which were being sold. Since the commission knew that nursing homes were being sold at higher per bed costs, in transactions not shown to be other than arm's length, the master concluded that the limitations were "not fair and reasonable under a cost reimbursement system."

We draw a different conclusion. There was testimony that the value of nursing homes rose after 1966, that homes were currently selling for more than the amounts set forth in the regulations, and that those amounts had been submitted to the commission at its direction as limitations on appreciation for homes with a high capital cost "because of frequent change in ownership." We infer that past rates established

by the commission and expectations as to future rates had produced active trading in nursing homes at rising prices, and that the commission validly acted to limit such expectations to fair and reasonable rates based on average original costs adjusted for inflationary changes in such costs. Cf. Priest, Principles of Public Utility Regulation, 188-190 (1969); Bauer, Updating Public Utility Regulation, 77-78 (1966).

9. *Legal and accounting expenses.* Paragraphs 8 (c) and 8 (d) of the 1969 Regulations include legal, accounting and auditing fees in reimbursable cost, but exclude such fees for services in connection with rate appeals to the commission. The master concluded that the exclusions are consistent with the general rule in matters involving litigation and are fair and reasonable in the circumstances. We agree. See *Aiello* v. *Commissioner of Pub. Welfare,* 358 Mass. 91, 92 (1970). Compare *Cabot Nursing Home, Inc.* v. *Rate Setting Commn.* 359 Mass. 686, 690-691 (1971).

10. *Educational expenses.* Paragraph 8 (f) of the 1969 Regulations states that educational expenses will be allowed up to 50% of the total costs incurred for non-owner employees if conducted by recognized schools or other approved groups for administration and nursing. The master found that the Department of Public Health recommends that nursing home personnel take advantage of continuing educational opportunities, but that they are not required to do so. Programs and assistance are available through the Department of Public Health. The master concluded that the limitations on reimbursement are fair and reasonable. We agree. The result is to reimburse the expenses only if the owners and administrators think the expenses are sufficiently useful to justify spending some of their own money. The alternative would be for the commission to review and approve the educational programs in advance.

11. *Fringe benefits.* Paragraph 8 (h) of the 1969 Regulations allows reimbursement of 75% of premium costs of the first $2,000 of coverage under group life, accident and dismemberment insurance, and 75% of total premium costs

for health insurance. Fifty per cent of full-time employees must be covered. The master found that some homes pay none of this cost and others vary in percentage of cost covered up to 100%. The 75% limitation was determined on the basis that the State, counties and municipalities pay that percentage for their employees. Nursing homes compete with hospitals for personnel, and reimbursement of hospitals for such costs is limited only by the test of reasonableness. The master concluded that the 75% limitation was not based on relevant considerations, and that it is not fair and reasonable to limit reimbursement except by the test of reasonableness.

We agree that the reason given for the 75% limitation does not support it. The governmental units referred to pay 75% of the premium cost for their employees; a nursing home which adopted a similar plan would be allowed as a reimbursable cost only 75% of the 75%. Nevertheless, we think the regulation was within the discretion of the commission, in the interest of uniform treatment of nursing homes with different policies and for the reasons given above with respect to educational expenses.

12. Decrees are to be entered by the single justice declaring that the 1969 Regulations were validly adopted by the commission and that St. 1969, c. 800, § 6, is not unconstitutional on its face or as construed and applied to the plaintiffs.

*So ordered.*