CAROLINE C. BURRELL & another, trustees, *vs.* CHECKER TAXI COMPANY.

Suffolk. May 14, 1934. — June 25, 1934.

Present: RUGG, C.J., PIERCE, FIELD, DONAHUE, & LUMMUS, JJ.

*Contract,* Validity, For use of taxicab stand. *Way,* Public: taxicab stand.

A contract, effective during the years 1924 through 1928, between the owner of a hotel building abutting on a public way in Boston and a taxicab company, providing for the use by the company, on payment of a certain sum per month, of a special hackney stand in the way in front of the building, of a telephone, of a bell or gong attached to the inside of the building and designed to summon the taxi starter to the telephone, and of a locker in the basement of the building for the keeping of records and the convenience of employees of the company, where it appeared that the police commissioner in each of the years,

with the assent of the owner, issued a license or permit for the maintenance of the stand and that the licenses or permits would not have been granted without that assent, was neither illegal, contrary to public policy, nor without consideration; and the owner was entitled to recover unpaid monthly sums in an action of contract.

CONTRACT upon an account annexed for "use of premises in connection with permit or license to use taxi stand in front of the Thorndike Building, Boston, Massachusetts, 10 months at $175.00 per month, $1,750.00." Writ dated December 12, 1928.

In the Superior Court, the action was tried before *Bishop*, J. Material evidence is described in the opinion. At the close of the evidence the defendant moved that a verdict be ordered in its favor. The motion was denied. The defendant then asked for rulings in substance that, if the plaintiffs should show that they had entered into a contract, expressed or implied, wherein or whereby the consideration or a substantial part of the consideration was that the defendant should be allowed to use a taxi stand in front of the Thorndike Building in Boston, said stand being located in and on a public street in said Boston, said contract was illegal, void and against public policy, and was without consideration moving from the plaintiffs, and that the plaintiffs could not recover. The requests were refused. The record states: "Thereupon the court submitted the case to the jury under instructions to which no exception was taken."

There was a verdict for the plaintiff in the sum of $2,222.50. The defendant alleged exceptions.

In this court, the defendant's sole contentions were that the contract relied on by the plaintiff was illegal, against public policy, and without consideration.

*J. F. Myron*, (*C. T. Cottrell* with him,) for the defendant.
*J. DeCourcy*, for the plaintiffs.

PIERCE, J. This is an action of contract which was tried to a jury. The plaintiffs are trustees of the William H. Thorndike Trust, and as such are the owners of the Thorndike Building premises located at the corner of Boylston and Church streets in the city of Boston.

The action is based on a contract between the plaintiffs

and the defendant which, the evidence would warrant the jury in finding, was made in 1924. By this contract the defendant agreed to pay the plaintiffs $175 a month for the use of the special hackney stand on Boylston Street in front of the Thorndike premises, and for the use of a telephone and a bell or gong which was attached to the inside of the Thorndike Building and was designed to summon the taxi starter to the telephone. The defendant also had the use of a steel locker in the basement of the Thorndike Building where records of the defendant company could be kept; the locker was also used for the convenience of the defendant's employees.

In 1922, another taxi service company made a similar agreement with the plaintiffs for the use of the special hackney stand, the telephone, bell or gong and locker. In 1924, the defendant "took over" that taxi company. The defendant's president, one Frank Sawyer, went to one Thorndike H. Whittemore, the active manager of the trust, and they agreed that the defendant should have the use of the special stand upon the same terms the other taxi company had had it. Upon the acceptance of the proposed agreement by the plaintiffs the defendant made an application to the police commissioner of the city of Boston for the designation of a special stand for hackney carriages in front of the Thorndike Building. The requested permit was granted by the police commissioner and the defendant began at once to use the special stand and the telephone, bell or gong and locker, and continued to pay $175 a month therefor. When the president of the defendant company made application for the hackney stand location, Whittemore assented to the defendant having a special hackney stand license at the requested location and Sawyer knew that "if objection was made by Mr. Whittemore," as one of the owners of the adjacent abutting premises, "he could not very well get the license or permit." The license or permit for special stands during the period of the defendant's occupancy until February, 1929, ran for annual periods and each year after the issuance of the license for the year 1924 the plaintiffs assented to an application of the defendant for a special stand license

or permit up to and including the year 1928. The defendant did not apply for a license for the stand for the year February, 1929, to February, 1930. It gave up the stand in January, 1929, and the use of the telephone, bell or gong, and locker.

Early in 1928, the defendant's president, Sawyer, went to the managing trustee, Whittemore, and said he could not afford to pay $175 a month, that he could afford to pay only $75 a month. Whittemore replied that that sum would not interest the trustees, he would not consider it. He said that the trustees would have to accept an offer made to them by the Beacon Hill Taxi Company, which was in excess of the rental the defendant company was paying. On March 12, 1928, the defendant company sent to the plaintiffs a check for $75. On March 14, 1928, Whittemore returned the check in a letter addressed to the defendant which read in part as follows: "I am returning this [check] for correction as it reads $75.00 instead of the correct amount, $175.00." On March 28, 1928, Whittemore received a letter from Sawyer, enclosing the same check for $75, and stating, in substance, that the defendant company understood, in view of the talk between Sawyer and Whittemore, that the amount would be agreeable as a future rental. Whittemore, under date of March 30, 1928, wrote a second letter to the defendant company, returning the check and saying, in substance, that the rental to any taxi company would not be less than $175 a month, and that if the defendant could not pay this amount the agreement would have to be terminated. This letter was never answered by the defendant. From March, 1928, the defendant neither paid any rent nor sent any checks, although the plaintiffs from month to month, beginning early in 1928, sent out a statement to the defendant to show the amount due for current rent and the statements were received by the defendant. It continued to use the telephone and locker in the basement in connection with the street stand through January, 1929, when it vacated the plaintiffs' premises and gave up the stand.

In December, 1928, the plaintiffs brought this action. At the close of the evidence the defendant requested the

judge to direct a verdict in its favor. The motion was denied and the defendant duly excepted. The defendant then requested the judge to give certain instructions in accord with its amended answer, in substance that the contract was without consideration, was illegal, void and against public policy. These requested instructions were denied and the defendant duly excepted. Thereupon the judge submitted the case to the jury under instructions to which no exception was taken. The jury returned a verdict for the plaintiffs.

The denial of the motion was right. On the uncontradicted evidence the defendant entered into a contract expressed or implied with the plaintiffs in March, 1924, whereby the defendant in consideration of the payment of $175 a month was permitted to use a special stand for hackney carriages on Boylston Street, Boston, adjacent to and abutting on the premises of the plaintiffs, and also certain incidental privileges on the premises of the plaintiffs as such stand and incidental privileges had been used by another taxi company under a similar agreement with the plaintiffs before 1924. It is not denied by the defendant that the plaintiffs, under the contract, permitted the defendant to use and enjoy the special stand and the incidental use of a telephone, bell or gong and a steel locker, without hindrance or obstruction from March, 1924, until February, 1929, when the defendant gave up the stand and quit. It is not denied by the defendant that it paid under the agreement $175 a month during the years 1924, 1925, 1926 and 1927. It is, however, contended by the defendant that the amount to be paid as rental was changed to $75 a month under an agreement in 1927 or in February, 1928, and if not so changed the contract was cancelled in February or March, 1928, and that thereafter there was no specified sum agreed upon to be paid by said defendant for said rights and privileges.

On the above facts it is plain that the defendant was liable to the plaintiffs for the use and occupation of the cab stand and privileges annexed, to the amount of the fair value of such rights and privileges for the period between February 1, 1928, and November 30, 1928. And it must be

assumed that the judge gave appropriate instructions covering that possible situation.

Upon the facts which the jury were warranted in finding it is plain that the judge could not rightly have ordered a verdict for the defendant, unless, as the defendant contends, the agreement was illegal, and contrary to public policy on the ground that a private abutting owner, having a fee in the street adjacent to his premises, during the period covered (1924–1928) could not legally receive compensation for assenting to the granting of the special privilege or for assenting to the issuance of a license or permit by the police commissioner, without which no license or permit would be issued by that official. The uncontradicted evidence discloses that the police commissioner in each year from 1924 until 1929 issued a license or permit to the defendant with the assent of the plaintiffs. It is clear the defendant during the entire period covered by the agreement with the plaintiffs used the taxicab stand under a series of annual licenses duly issued by the police commissioner, and in connection therewith used the incidental privileges attached by the contract to the use of the taxicab or special stand license. The use of the special stand under the permit of the police commissioner was not illegal, whatever may be said of the right of municipalities to authorize special stand licenses against the protest of abutting owners having a fee in the public street. See G. L. c. 40, § 22, as to the authority of cities and towns to regulate the use of carriages and vehicles, which statute is a reënactment of St. 1847, c. 224, § 1. The police commissioner of the city of Boston has all the power conferred upon the board of aldermen of a city by said § 22. See *Commonwealth* v. *Morrison*, 197 Mass. 199–204, for history of the statutory law relating to hackney carriage stands. See also Rule 58 relating to hackney carriages of the Rules and Regulations for the Police Department of the City of Boston for 1898, 1903, 1913, and 1927. These several rules, in substance the same, authorize the granting of special stands for licensed hackney carriages.

We find no error prejudicial to the defendant in the admission of the testimony that the Beacon Hill Taxi Com-

pany paid $200 a month and occupied the premises for eighteen months after the defendant left the premises in January, 1929, and the exception of the defendant is not argued in its brief.

*Exceptions overruled.*