TOWN TAXI INCORPORATED & others[1] *vs.* POLICE COMMISSIONER OF BOSTON.

Suffolk. December 7, 1978. — March 23, 1979.

Present: QUIRICO, BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Boston. Taxicab. Regulation. Practice, Civil,* Appeal.

There was no merit to a contention of taxicab operators that a regulation issued by the police commissioner of the city of Boston which established a twenty per cent discount fare for elderly and handicapped persons was confiscatory. [579-581]

The police commissioner of the city of Boston had authority under St. 1930, c. 392, § 4, as amended by St. 1934, c. 280, § 1, to establish a twenty per cent discount taxicab fare for elderly and handicapped persons. [581]

———

[1] The action was brought by Town Taxi Incorporated; Checker Taxi Company; Max Dobro, Inc.; Congress Taxi Association, Inc.; Yellow Cab Corp. of Boston & Brookline; Joe Cab, Inc.; and Fitz Taxi, Inc., "on behalf of themselves and all members of the City of Boston Cab Association." Despite the formal designation of the case, neither the parties nor the judge appears to have treated the case as a class action under Mass. R. Civ. P. 23, 365 Mass. 767 (1974).

Taxicab operators did not have standing to challenge as discriminatory a regulation issued by the police commissioner of the city of Boston which established a discount fare for elderly and handicapped persons. [581-582]

The police commissioner of the city of Boston had authority under St. 1930, c. 392, § 4, as amended by St. 1934, c. 280, § 1, to require the submission of certain financial reports as a condition to the renewal of a taxicab medallion. [583-586]

The police commissioner of the city of Boston had the power to require corporate taxicab medallion holders to submit copies of Federal income tax returns as a condition to the renewal of a medallion where the commissioner presented substantial evidence that the returns were needed in order to provide reliable data on which to predicate rate revisions. [586-588]

CIVIL ACTION commenced in the Superior Court on July 9, 1976.

The case was heard by *Good*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered dir﹏﹏ appellate review.

*Nicholas Foundas* for the defendant.

*David G. Hanrahan* for the plaintiffs.

QUIRICO, J. The plaintiffs, operators of taxicabs in the city of Boston (Companies), brought this civil action against the police commissioner of the city of Boston (Commissioner) to obtain declaratory and injunctive relief from certain provisions of Special Order No. 76-59 (Special Order), which was issued by the Commissioner on June 18, 1976, and which purports to regulate various aspects of the Companies' business activities. Following an evidentiary hearing, a judge of the Superior Court entered a decree upholding certain parts of the Special Order and enjoining enforcement of other parts. The Commissioner appealed, and we ordered the case transferred to this court on our own motion. See G. L. c. 211A, § 10(A). We reverse in part.

We summarize the background facts necessary for understanding the issues and reserve elaboration for the body of this opinion. By St. 1930, c. 392, as amended by

St. 1931, c. 408, § 7, and by St. 1934, c. 280, the Legislature empowered the Commissioner[2] to regulate the taxi business in Boston and to fix rates of fare. In pursuance of his duties under the statute, the Commissioner has issued the authorized maximum number (1525) of taxicab "medallions." Each medallion entitles the holder thereof to operate a taxicab within the city. The right of persons not holding a Boston medallion to solicit passengers within the city is limited by St. 1963, c. 386. The Commissioner also licenses the drivers of taxicabs and designates areas of the public streets for use as taxi stands. St. 1930, c. 392, §§ 1, 3.

On February 2, 1976, the Commissioner held a public hearing to consider a proposed increase in taxicab rates, and he issued the Special Order four months later in at least partial reliance on the information gathered at the hearing. In addition to specifying new rates based on mileage, waiting time, and time of day, the Special Order prescribes a twenty per cent discount fare for elderly and handicapped passengers, mandates annual financial reporting by medallion holders, and defines a number of regulatory offenses and the penalties therefor. The Companies brought the present action in order to challenge many provisions of the Special Order that are unrelated to metered rates.

Although the judge upheld the Special Order in so far as it defines regulatory offenses, he invalidated the penalty clauses for their failure to provide expressly for presuspension and prerevocation hearings. He declared the discount program invalid as well. Finally, he invalidated the financial reporting requirement to the extent it requires

---

[2] The 1930 Act and the amendments thereto referred to the police commissioner appointed by the Governor pursuant to St. 1906, c. 291, § 7. The Legislature created a new office by the same name in St. 1962, c. 322, which provided for mayoral appointment. This statute simultaneously carried forward the powers of the previous Commissioner, *id.* § 2, so that no question arises in this case of the present Commissioner's authority under St. 1930, c. 392, to regulate taxicabs.

filing of State and Federal tax returns or conditions medallion renewal on financial reporting. By failing to appeal from those parts of the judgment adverse to them, the Companies have waived any issues arising from the judge's rulings concerning the definition of regulatory offenses. *Kerrigan* v. *Boston*, 361 Mass. 24, 31 (1972).

Although the Commissioner's appeal was sufficiently broad to bring every ruling adverse to him before us, we consider only those issues actually briefed by him. Mass. R.A.P. 16(a)(4), as amended, 367 Mass. 919 (1975). See, e.g., *Board of Appeals of Maynard* v. *Housing Appeals Comm.*, 370 Mass. 64, 68 (1976). These are: (1) whether the discount fare provision is valid, (2) whether the Commissioner may impose financial reporting obligations as a condition to medallion renewal, and (3) whether, if the Commissioner may require financial reports, he may require the filing of copies of Federal income tax returns. As to these issues, we hold that the judge erred in ruling against the Commissioner. As to the necessity for presuspension or prerevocation hearings and as to the lawfulness of the requirement that certain medallion holders file copies of their State income tax returns, we express no view on the merits. Our affirmance of the judgment in so far as it deals with these two matters is dictated by the Commissioner's failure to brief the issues thereby raised.

1. *Discounts for elderly and handicapped persons.* The Commissioner's Special Order establishes a twenty per cent discount fare for elderly and handicapped persons. A previous program authorized elderly persons to pay cab fare with discount coupons, which were purchased at municipal offices and redeemed by the city at some later time. Presumably, the new program was to have operated in a similar way. While characterizing the discount program as "humane" and noting that "[n]o sufficient analysis or breakdown of costs, no description of the actual impact on the finances of the [Companies] was presented to the Court," the judge nevertheless held the program invalid. This was error on the record before him.

This case was tried and decided below on the ground that the discount program was confiscatory. The case of *Commonwealth* v. *Boston & N. St. Ry.*, 212 Mass. 82 (1912), presented a factual situation almost identical to the one at bar. In that case, the Legislature established a discount fare for school children traveling by streetcar between home and school, and the defendant sought to invalidate the discount. We held that the defendant railway had the burden of showing that the total return generated by the bifurcated rate structure was too low, and we held that it did not carry its burden merely by showing that one aspect of its service was rendered unprofitable. *Id.* at 85-86. In contrast to the present case, the defendant in *Boston & N.* introduced at least some evidence of its costs and income. See *id.* at 86-87. Here, the Companies have relied solely on the unsubstantiated argument that their total revenues would be higher if elderly and handicapped persons paid the fare already established for other persons. They have not, however, proved that the rate structure operating as a whole will produce a confiscatory total return. The judge appears to have assumed that the Commissioner first established a rate structure and determined the minimum rates necessary for the plaintiffs to operate at a reasonable profit, and that he then fixed the rate requiring them to transport elderly and handicapped persons at a twenty per cent discount, thus producing a reduced total return which was confiscatory. Such an assumption is not supported by the evidence. Accordingly, and as a matter of law, the Companies failed to carry the burden placed on them by *Boston & N.*, and they are not entitled to relief on their claim that the discount fare was confiscatory.[3] Cf. *Borden* v. *New York, N.H. & H.R.R.*, 339 Mass. 266, 272 (1959)

[3] Of course, the Companies are not precluded from seeking rate adjustments if experience shows that the effect of the combined rates with the discount program actually yields an unreasonably low return. See *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474, 498-499 (1973).

(emphasizing importance of burden of proof when inferences equally balanced).

The Companies now argue, in effect, that *Boston & N.* should not control this case because the Commissioner rather than the Legislature set the rate complained of. Unless, however, the Commissioner exceeded the authority "from time to time [to] fix maximum and minimum rates" delegated to him by St. 1930, c. 392, § 4, as amended by St. 1934, c. 280, § 1, there can be no objection that he has usurped legislative power. The statutory language does not prescribe the precise pattern or details of the rate structure. It neither mandates nor precludes the establishment of a discount fare or fares based on mileage, waiting time, and shift differentials. Much is evidently left to the discretion of the Commissioner. See *Cambridge Taxi Co.* v. *City Manager of Cambridge*, 322 Mass. 108, 109-110 (1947). We emphasize that statutes of the present character must be reasonably construed to effectuate the obvious legislative purpose to provide for administrative regulation of a particular industry. The Commissioner is bound to set rates in consonance with the public interest and by reference to the reasonable economic needs of the Companies, but he is not to be constrained in detail by an overly technical interpretation of the authorizing statute.

Finally, the Companies argue that the discount program is invalid either because it discriminates between classes of passengers or because it requires them to charge one class of passengers a lower rate than another for identical services. It must be assumed on the present state of proof that full-fare passengers bear the economic burden created by the discount and are, therefore, the only persons who have standing to challenge the discriminatory impact of the rate structure. See *Aristocratic Restaurant of Mass., Inc.* v. *Alcoholic Beverages Control Comm'n No. 1*, 374 Mass. 547, 556-557 (1978); *Massachusetts Ass'n of Independent Ins. Agents & Brokers, Inc.* v. *Commissioner of Ins.*, 373 Mass. 290, 292-296 (1977).

The case of *Murphy Nursing Home, Inc.,* v. *Rate Setting Comm'n,* 364 Mass. 454, 461 (1973), on which the Companies rely as supporting their contention that the Commissioner is precluded from simultaneously requiring them to carry all persons desiring transportation and to charge one class a lower fare, proves at most that the rate structure involved here is judicially reviewable for reasonableness under the State and Federal Constitutions. As we have noted above, the Companies have failed to prove their case in this regard. Even without relying on principles of standing and burden of proof, however, we have serious doubt that giving a deserving class of passengers the right to use the services of a regulated monopoly like the Boston taxicab industry at a discount must be held to be against public policy. Cf. *Commonwealth* v. *Boston & N. St. Ry., supra;* G. L. c. 159, § 15 (common carriers may give certain discounts); G. L. c. 161, §§ 107-108 (street railways may give certain discounts, must give fifty per cent discount to school children).

In light of the principles we have stated, we hold that it was error for the judge to declare the discount program for elderly and handicapped persons to be null and void.

2. *Financial reporting regulations.* The Special Order establishes annual financial reporting obligations for all medallion holders. An individual holder is required by the Special Order to submit an income statement signed under the penalties of perjury.[4] In addition to being required to file other financial statements, a corporate holder is required to submit a copy of its most recent Federal income tax return (Form 1120) and, if its annual gross revenues exceed $50,000, of its most recent Massachusetts Corporate Excise Tax Return. This information

---

[4] Although the judgment refers to "Federal and state income tax returns," it is clear that individuals are not required by the Special Order to file copies of their income tax returns. The Special Order refers to the "Federal Income Tax Form 1120" and to the "Massachusetts Corporate Excise Tax Return." We may take judicial notice that these forms are used only by corporations.

must accompany an application for renewal of a medallion.

The judge held that the Commissioner may not require submission of copies of tax returns. He also held that the Commissioner has no power to condition renewal on submission of financial data. We conclude that both of these holdings are erroneous.

a. *Financial reporting as a condition to renewal.* Like the power to set rates discussed in part 1 of this opinion, the Commissioner's power to license and regulate the Boston taxi industry is found in St. 1930, c. 392, § 4, as amended by St. 1934, c. 280, § 1. That statute provides in relevant part that "[the] police commissioner shall annually grant hackney licenses in said city to suitable persons, firms and corporations who are owners of vehicles known as hackney carriages, if such person, or one member of such firm, resides in such city, or if the principal place of business of such corporation is in such city; provided, that, at any time within one year after the expiration of a license under this section, the holder thereof shall be entitled as of right, upon payment of the proper fee, to a renewal of such license, unless after a hearing before said commissioner it appears that he has good cause to refuse to issue the same. Licenses granted under this section shall be assignable, subject to the approval of said commissioner, and shall be subject to such other terms, conditions and limitations, and be issued subject to the payment of such fees, as said commissioner shall from time to time prescribe."

The present controversy concerns the proper construction of the language we have quoted and, in particular, of the words entitling a licensee to renewal "as of right." The Companies argue that, because renewal is a matter "of right," the Commissioner cannot condition it on the filing of annual financial reports. We disagree.

Prior to 1930, the Commissioner licensed both drivers and vehicles pursuant to G. L. c. 40, § 22,[5] and he also

_____
[5] General Laws c. 40, § 22, which now authorizes municipal regula-

assigned vehicles to specific hackney stands throughout the city in the exercise of judicially implied power. See *Commonwealth* v. *Matthews*, 122 Mass. 60, 63 (1877). A system developed in Boston whereby cab companies paid landowners for a recommendation to the Commissioner, who would in turn assign so called "special" stands on public ways abutting the landowner for use by the paying companies' cabs. See *Burrell* v. *Checker Taxi Co.*, 287 Mass. 108, 113 (1934). Under the former statutory system, certain taxi operators were able to preserve their monopoly position in the market for taxi services by retaining their special stands in front of busy transportation terminals from year to year. See *Morley* v. *Police Comm'r of Boston*, 261 Mass. 269, 281 (1927), cert. denied, 276 U.S 625 (1928), where this court rejected an attempt by the Independent Taxi Operators Association to upset the traditional system.

By a series of enactments during the 1930's, the Legislature first modified, and then abolished, the system of special stands. See St. 1930, c. 392, §§ 5-8 (mandating public stands, forbidding payments to abutters for special stands); St. 1938, c. 508 (eliminating special stands in cities and towns accepting provisions); *Sullivan* v. *Police Comm'r of Boston*, 304 Mass. 113, 114 n.* (1939) (describing effect of St. 1938, c. 508). For some insight into the skirmishing that preceded the 1938 abolition, see *Opinion of the Justices*, 294 Mass. 607, 609-610 (1936), and *Opinion of the Justices*, 300 Mass. 602, 605 (1938), where members of this court considered initiative petitions on the subject of special stands.

During the same period, the Legislature also changed the nature of a Boston hackney license. A special commission appointed in 1929 to investigate the problem of spe-

tion of taxicabs in every city and town but Boston, can be traced to St. 1847, c. 224, §§ 1-2. See *Commonwealth* v. *Rice*, 261 Mass. 340, 343-344 (1927). The 1847 act, in turn, replaced the more detailed regulatory scheme established for Boston alone by St. 1795, c. 49, § 1 (repealed 1796), and St. 1796, c. 31, §§ 1-6 (repealed 1847).

cial stands[6] recommended limiting the number of licenses in order, it said, to prevent "unreasonable and destructive competition." Report of the Special Comm'n on Licensing of Taxicab Stands in Boston, 1930 Senate Doc. No. 240, at 18. The Legislature initially heeded this recommendation by enacting a limit of 3,000, see 1930 Senate Doc. No. 396, § 4, but it later recalled the bill from the Governor to delete the limit. See 1930 Senate Journal 722. Three years later, however, the Legislature authorized the Commissioner to limit the number of licenses by reference to "public convenience and necessity" and gave a person aggrieved by a refusal to increase the limit a right of appeal to the Department of Public Utilities. St. 1933, c. 306. The Legislature again dealt with limiting the number of taxicabs in Boston in St. 1934, c. 280, § 1. That statute authorized the Commissioner to fix a limit within the range of 900 and 1,525. Of special relevance to this case, the 1934 act also added the language quoted earlier with regard to assignability and renewal as a matter of right.

The question whether the taxi industry monopoly created by the applicable statutes is wise as a matter of economic and social policy is, of course, not subject to judicial review. We may, however, properly take note of the nature of the industry in deciding what regulatory powers the Legislature intended to delegate to the Commissioner. In light of the monopolistic nature of the industry, we think it beyond reasonable dispute that the Commissioner may demand financial information on a regular basis in order to perform his rate-setting function. Cf. *Multi-Line Ins. Rating Bureau* v. *Commissioner of Ins.*, 357 Mass. 19, 21-22 (1970); *Commissioner of Ins.* v.

---

[6] Presumably in response to the denial of certiorari in the *Morley* case, a bill was filed in the 1929 General Court to modify the special-stand system. See 1929 House Doc. No. 453. By Res. 1929, c. 53, the Legislature empowered the special commission to study the bill and related subjects. The commission's recommendations concerning special stands were ultimately adopted in St. 1930, c. 392, §§ 5-8.

*First Nat'l Bank*, 352 Mass. 74, 79-80 (1967); *School Comm. of New Bedford* v. *Commissioner of Educ.*, 349 Mass. 410, 413-414 (1965), where we gave a broad interpretation to statutes granting investigatory powers to various State officials. See also G. L. c. 233, § 8 (police commissioner may summon witnesses, compel production of documents); 1 K.C. Davis, Administrative Law § 3.04, at 176-180 (1958) (under modern law, agencies may initiate investigations). The implication of this power is nothing more than an expression of the settled rule that "[w]here a grant of power is expressly conferred by statute upon an administrative officer or board or where a specific duty is imposed upon them, they in the absence of some statutory limitation have authority to employ all ordinary means reasonably necessary for the full exercise of the power and for the faithful performance of the duty." *Bureau of Old Age Assistance of Natick* v. *Commissioner of Pub. Welfare*, 326 Mass. 121, 124 (1950). In this case, the Commissioner has the duty to set the rates charged by a publicly regulated monopoly, and denial of the right to require financial disclosures would render that duty difficult, if not impossible, of fulfillment. That right includes the power to take reasonable measures, including suspending or revoking a taxi medallion, after a refusal to disclose. It would be no valid objection to the exercise of this power that suspension or revocation for failure to file financial reports is unrelated to the manner in which a company conducts the business of passenger carriage. See *Hersch* v. *Police Comm'r of Boston*, 319 Mass. 428, 433 (1946) (violation of OPA gasoline regulations ground for revocation).

We hold that it was error for the judge to invalidate the financial reporting requirements as being illegally tied to medallion renewal.

b. *Corporate income tax returns.* We deal next with the Commissioner's power to require submission of copies of Federal income tax returns by corporate medallion holders. The confidentiality of Federal tax returns and of the

information contained therein is regulated in great detail by 26 U.S.C. § 6103 (1976). By its express terms, § 6103 restrains disclosure only by Federal officials and certain other persons receiving returns and information under the provisions of the section. *Id.* § 6103(a). No statutory provision bars the compulsory production of copies of tax returns remaining in the taxpayer's possession. *Heathman* v. *United States Dist. Court,* 503 F.2d 1032, 1035 (9th Cir. 1974). The questions before us, therefore, are whether Federal case law creates any privilege belonging to a taxpayer to withhold such copies and, if so, whether the privilege applies in the present case.

The Supreme Court has stated in dictum that copies of Federal tax returns "in the hands of the taxpayer" are not absolutely privileged. *St. Regis Paper Co.* v. *United States,* 368 U.S. 208, 219 (1961). In ruling on discovery motions, however, the lower Federal courts have fashioned a sort of qualified privilege by imposing a high standard of relevancy before requiring parties to disclose such copies. See *Mitsui & Co.* v. *Puerto Rico Water Resources Auth.,* 79 F.R.D. 72, 80-81 (D.P.R. 1978), and cases cited. Judge Sirica expressed the policy underlying the general reluctance to compel discovery as follows: "Unless taxpayers are assured that the personal information contained in their tax returns will be kept confidential, they likely will be discouraged from reporting all of their taxable income to the detriment of the government. The opposite is also true. Unless confidentiality is guaranteed, taxpayers will likely refrain from using all of the tax-saving measures to which they are lawfully entitled." *Payne* v. *Howard,* 75 F.R.D. 465, 469 (D.D.C. 1977). Consistent with this policy, courts have ordered discovery of copies of tax returns in cases where the taxpayer's income was directly in issue, where disclosure would not create a motive to falsify tax returns, and where Congress itself had already created an analogous exception to the confidentiality requirement, like, for example, that contained in 26 U.S.C. § 6103 (l)(6)(A) (1976) pertaining to

child support enforcement agencies. See *Shaver* v. *Yacht Outward Bound,* 71 F.R.D. 561, 563-564 (N.D. Ill. 1976); *Houlihan* v. *Anderson-Stokes, Inc.,* 78 F.R.D. 232, 234 (D.D.C. 1978); *Miller* v. *Superior Court,* 71 Cal. App. 3d 145, 148-149 (1977).

Federal decisions vary somewhat as to the scope of a privilege to withhold copies of returns. The Ninth Circuit court held in *Heathman* v. *United States Dist. Court, supra,* that no such privilege exists, although the holding may have been colored by the need of the requesting party to untangle the business relationship among the defendants. Without citing *Heathman,* however, the same court later approved a privilege rule based on balancing the need for discovery against the policy favoring confidentiality. *Premium Serv. Corp.* v. *Sperry & Hutchinson Co.,* 511 F.2d 225, 229 (9th Cir. 1975). Relying on a broad reading of *Heathman,* the district judge in *Maggio* v. *Hynes,* 423 F. Supp. 144 (E.D.N.Y. 1976), held— without explicitly balancing anything against the policies favoring confidentiality—that a State official could subpoena copies of tax returns in connection with an investigation of nursing homes. *Id.* at 146. *Maggio,* and perhaps *Heathman* as well, may be read as supporting the Commissioner's argument that disclosure may be compelled.

We prefer to rest our decision on the narrower ground of a qualified right to confidentiality. The Commissioner adduced expert testimony that copies of tax returns were needed in order to verify the data contained in other reports without putting the Companies to the expense of a full audit, all to the end that the Commissioner might have reliable data on which to predicate rate revisions. We think that the Commissioner's need to inspect copies of tax returns is supported by substantial evidence, and we therefore hold that the judge erred in ruling to the contrary.

3. *Judgment entered in the Superior Court.* At the close of the hearing on the petition, the judge filed a "Memo-

randum of Decision" in which he stated findings of fact and made many rulings of law based thereon. He then caused a judgment to be entered in the following form:

"It is Ordered and Adjudged,

"1. That the following provisions of the rules and regulations promulgated by the Police Commissioner of the City of Boston under date of June 18, 1976, and denominated, Special Order #76-59, 'New Rates of Fare, Hackney Carriages,' amending Rule 65 of the 1950 Rules Manual of the Boston Police Department are hereby declared null and void.

"a. The penalty of revocation or suspension of a license for violations of the maximum flat rate outside the designated metered rate areas without a full evidentiary hearing with reference to alleged violations.

"b. The automatic revocation of the medallion and hackney licenses of both the owner and driver for failure to display rate cards in each cab without providing for a full evidentiary hearing with reference to alleged violations.

"c. The establishment of 20% discount programs for elderly and handicapped persons.

"d. Requiring as a condition of renewal of a hackney medallion, the submission of financial information including Federal and state income tax returns.

"e. The regulation declaring all licenses void until financial information is supplied to the Commissioner.

"f. Automatic suspension and revocation of medallions and licenses for violation notices without provision for a full evidentiary hearing on said notices.

"g. Only so much of the regulation establishing a maximum flat rate for trips beyond the designated metered areas which declares rates in excess of the maximum to be 'an extortionate charge for service.'

"2. The Police Commissioner of the City of Boston is permanently enjoined from enforcing or attempting to enforce the foregoing provisions of Special Order #76-59 amending Rule 65."

We noted earlier in this opinion that "[a]lthough the Commissioner's appeal was sufficiently broad to bring every ruling adverse to him before us, we consider only those issues actually briefed by him." As thus limited, the only portions of the judgment with which we are concerned are those included in pars. 1c, 1d, and 1e, and in a portion of par. 2.

4. *Conclusion.* for the reasons stated in our opinion, we order that the portions of the judgment contained in pars. 1c, 1d, and 1e be struck. In lieu thereof, the judgment is to contain a declaration to the effect that (a) the establishment of the twenty per cent discount programs for elderly and handicapped persons, (b) the requirement that as a condition of renewal of a hackney medallion the applicant shall submit specified financial information, including in some instances Federal income tax returns,[7] and (c) the provision of a penalty for failure seasonably to file the required financial information, are within the power delegated to the Commissioner and that his promulgation thereof is supported by substantial evidence.

By reason of what we have said in the preceding paragraph, par. 2 of the judgment must be modified to the extent necessary to exclude the portions of the order and regulations involved in pars. 1c, 1d, and 1e from its sweep.

The remaining portions of the judgment, including the part of par. 1d relating to State income tax returns, are deemed to be affirmed, not because we have reviewed them and found them valid (which we have not done), but because their validity has not been placed in issue by the Commissioner in his brief.

The case is remanded to the Superior Court with instructions to vacate the earlier judgment and to enter a new judgment in conformity with this opinion.

*So ordered.*

---

[7] Because the Commissioner failed to address the subject of State income tax returns in his brief, we treat his claim of error in that regard waived, as we do with all other issues not argued in the brief.