ANITA WRIGHT *vs.* SHRINERS HOSPITAL FOR CRIPPLED
CHILDREN & another.[1]

Suffolk. October 7, 1991. - April 16, 1992.

Present: LIACOS. C.J., WILKINS, LYNCH, O'CONNOR, & GREANEY. JJ.

*Employment*, Termination. *Contract*, Employment. *Public Policy. Unlaw-
ful Interference. Nurse.*

The action of a hospital corporation in terminating the at-will employment
of a registered nurse would not, as matter of law, have violated public
policy, even if the termination were shown to have been in reprisal for
the employee's criticism of the hospital during interviews with members
of a survey team representing the national organization to which the
hospital belonged. [472-476] LIACOS, J., dissenting.

In an action by a nurse who was discharged from her at-will employment
by a hospital corporation, the administrator of the hospital was entitled
to judgment notwithstanding the verdict on the plaintiff's claim of in-
tentional interference with contractual relations, where the corporation
was legally entitled to discharge the plaintiff, and where there was no
evidence that the administrator's purpose in effecting her discharge was
unrelated to a legitimate corporate interest. [476]

CIVIL ACTION commenced in the Superior Court Depart-
ment on July 1, 1988.

The case was tried before *John C. Cratsley*, J.

The Supreme Judicial Court granted a request for direct
appellate review.

*William F. Joy, Jr. (Benjamin Smith* with him) for the
defendants.

*Kevin G. Powers* for the plaintiff.

O'CONNOR, J. In this case, which is here on direct appel-
late review, we consider the sufficiency of the evidence to
warrant a jury's verdict of $100,000 in favor of the plaintiff,

[1]Salvatore Russo.

Anita Wright, against her employer, the defendant Shriners Hospital for Crippled Children (Shriners Hospital), on Wright's claim that Shriners Hospital wrongfully terminated her at-will employment in violation of public policy. We also consider the sufficiency of the evidence to warrant the jury's verdict of $50,000 against the defendant Salvatore Russo, the hospital administrator, for tortious interference with Wright's employment relationship with Shriners Hospital. We hold that the evidence was insufficient to warrant either verdict and that the trial judge should have allowed the defendants' motion for judgment notwithstanding the verdict. We reverse the judgments for the plaintiff and remand this case to the Superior Court for the entry of judgments for the defendants.

We summarize the evidence in the light most favorable to the plaintiff. *Smith-Pfeffer* v. *Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 146 (1989). Shriners Hospital hired Wright, a registered nurse, in 1976. Subsequently, she became assistant director of nursing, and she held that position until she was discharged in late February of 1987. At all times, she was an employee at will. Wright received excellent evaluations throughout her employment, including an evaluation in December, 1986, two months before her discharge. In June, 1986, a former assistant head nurse wrote a letter to the director of clinical affairs for the Shriners national headquarters detailing her concerns about the medical staff and administration at Shriners Hospital. Shriners Hospital is a separate corporation, but it is one of many Shriners facilities that are affiliated with the national headquarters. As a result of the letter, the national headquarters notified the defendant hospital administrator, Russo, that a survey team would visit Shriners Hospital in November, 1986. Russo was visibly upset. He spoke to the director of nursing about the letter and asked her: "Are you behind this? Is Anita Wright behind this?" The director of nursing denied that she was responsible for the letter. She did not address the question whether Wright was "behind" the letter.

The survey team visited the hospital in November and interviewed Wright and other employees. Wright told the survey team that there were communication problems between the medical and nursing staffs. She detailed problems with the assistant chief of staff and gave specific examples of patient care problems. The survey team reported Wright's comments to the assistant chief of staff.

Two members of the survey team prepared reports. In his report issued on December 22, 1986, Dr. Newton C. McCollough, director of medical affairs for the national organization, wrote: "The relationships between nursing administration, hospital administration, and chief of staff are much less than satisfactory, and significant friction exists both as regard nursing/administration relationships and nursing/medical staff relationships. Communication and problem solving efforts in this relationship are poor to nonexistent." A report issued on January 5, 1987, by Jack D. Hoard, executive administrator for the national Shriners organization, also documented the problematic relationship between the nursing and medical staff. Both reports recommended a follow-up site survey to determine the impact of this conflict on patient care. McCollough's report stated that during her interview, Wright had made severe criticisms of the medical staff and had expressed concern over a lack of consistent procedures and standards for patient care. Hoard's report stated that Wright discussed the breakdown in communication between the nursing staff and the attending medical staff, which she said was leading to deteriorating morale among nurses.

Upon reading the survey team's reports, Russo again became upset and told the director of nursing that it was the nursing department's fault that the team was making another visit. He also stated at a department managers' meeting in December, 1986, "It seems there are people who spend their time trying to find fault with everything that everyone does, and those kinds of people we don't need here." Russo testified that, when he said that, he "possibly" was referring to statements made to the survey team. After the survey team's November, 1986, visit, Russo stopped speaking to

Wright or even acknowledging her presence. The survey team returned on February 18 and 19, 1987, specifically to review the problems between the medical and nursing staffs. On February 26, after consulting with the chairman and several officers of the board of governors of Shriners Hospital and with national corporate counsel, Russo ordered that Wright's employment be terminated for "patient care issues that had arisen as a result of the surveys."

Wright contends, and the defendants dispute, that the jury would have been warranted in finding that Shriners Hospital fired her from her employment at will in retaliation for her having criticized the hospital, specifically in regard to the quality of care rendered to patients, to the Shriners national headquarters survey team. Wright further asserts that such a retaliatory firing violates public policy and is therefore actionable. See *Hobson v. McLean Hosp. Corp.*, 402 Mass. 413, 416 (1988); *DeRose v. Putnam Management Co.*, 398 Mass. 205, 210 (1986). It is a question of law for the judge to decide whether a retaliatory firing in these circumstances would violate public policy. *Mello v. Stop & Shop Cos.*, 402 Mass. 555, 561 n.7 (1988). We hold that a termination of Wright's employment at will in reprisal for her critical remarks to the survey team would not have violated public policy. Therefore, we need not address the disputed matter of the sufficiency of the evidence to warrant a finding that the firing was indeed in retaliation for the criticism.

We begin with the general rule that "[e]mployment at will is terminable by either the employee or the employer without notice, for almost any reason or for no reason at all." *Jackson v. Action for Boston Community Dev., Inc.*, 403 Mass. 8, 9 (1988). We have recognized exceptions to that general rule, however, when employment is terminated contrary to a well-defined public policy. Thus, "[r]edress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." *Smith-Pfeffer v. Superintendent of the Walter E.*

*Fernald State Sch., supra* at 149-150. We have also held that redress was available to an at-will employee who was discharged in retaliation for his cooperation with a law enforcement investigation concerning his employer. *Flesner* v. *Technical Communications Corp.*, 410 Mass. 805, 811 (1991). Although the employee in *Flesner* was not required by law to cooperate, we reasoned that the Legislature had clearly expressed a policy encouraging cooperation with criminal investigations as indicated by statutes providing for reimbursement of expenses for persons assisting in investigations and immunity for witnesses testifying in grand jury investigations. *Id.* at 810.

The trial judge's view of the law was that public policy was violated if Shriners Hospital fired Wright in reprisal for her having criticized the hospital in interviews with the survey team. As is clear from his instructions to the jury, the judge's view was based in part on "the duty of doctors and nurses, found in their own code of ethics, to report on substantial patient care issues." We would hesitate to declare that the ethical code of a private professional organization can be a source of recognized public policy. We need not consider that question, however, because no code of ethics was introduced in evidence in this case.

It is also clear from his instructions that the judge's view was based in part on "various state laws of the commonwealth, requiring reports on patient abuse." The judge did not identify the State laws he had in mind. General Laws c. 119, § 51A (1990 ed.), requires nurses and others to make a report to the Department of Social Services concerning any child under eighteen years of age who they have reason to believe is suffering from physical or sexual abuse or neglect. Similarly, G. L. c. 19A, § 15 (*a*) (1990 ed.), requires nurses and others who have reasonable cause to believe that an elderly person is suffering from abuse to report it to the Department of Elder Affairs. Subsection (*d*) of that provision provides that no employer or supervisor may discharge an employee for filing a report. Finally, G. L. c. 111, § 72G (1990 ed.), requires nurses and others to report to the De-

partment of Public Health (department) when they have reason to believe that any patient or resident of a facility licensed by the department is being abused, mistreated, or neglected and provides a remedy of treble damages, costs, and attorney's fees for any employee who is discharged in retaliation for having made such a report. None of these statutes applies to Wright's situation, however, and we are unaware of any statute that does. Also, we are unaware of any statute that clearly expresses a legislative policy to encourage nurses to make the type of internal report involved in this case. In fact, Wright testified that she did not consider the patient care that caused her concern to be abuse, neglect, or mistreatment warranting a report to the department, nor did she feel that there was an issue of physician incompetence warranting a report to the board of registration in medicine as required by G. L. c. 112, § 5F (1990 ed.).

Wright urges us to recognize a regulation promulgated by the Board of Registration in Nursing as a source of public policy sufficient to create an exception to the general rule regarding termination of at-will employment. Title 244 Code Mass. Regs. § 3.02 (3) (f) (1986) describes the responsibilities and functions of a registered nurse, including the responsibility to "collaborate, communicate and cooperate as appropriate with other health care providers to ensure quality and continuity of care." Even if that regulation called for Wright to report perceived problems or inadequacies to the survey team, a doubtful proposition, we have never held that a regulation governing a particular profession is a source of well-defined public policy sufficient to modify the general at-will employment rule, and we decline to do so now. Furthermore, as we have noted above, Wright's report was an internal matter, and "[i]nternal matters," we have previously said, "could not be the basis of a public policy exception to the at-will rule." *Smith-Pfeffer* v. *Superintendent of the Walter E. Fernald State Sch., supra* at 151, citing *Mello* v. *Stop & Shop Cos., supra* at 560-561.

We agree with the dissent that the provision of good medical care by hospitals is in the public interest. It does not fol-

low, however, that all health care employees should be immune from the general at-will employment rule simply because they claim to be reporting on issues that they feel are detrimental to health care. In *Smith-Pfeffer*, *supra*, we held that there was no violation of a well-established public policy by an employer who discharged an employee for her actions in opposing a management restructuring plan proposed by the defendant acting superintendent as well as the possible appointment of the defendant to the position of permanent superintendent. *Smith-Pfeffer*, *supra* at 147-150. The employee's opposition to the plan and appointment were based, in part, on her perception that the restructuring would significantly alter the management relationships such that it would "compromise service delivery to the residents" and "constitute[ ] a threat to the well-being of the institution and its residents." *Id.* at 148, 151. The defendant conceded that the jury could have found that the "plaintiff had performed her duties in a superior manner" and that her "actions were motivated by a sincere commitment to the mentally retarded residents in her unit," and that the defendant terminated her "to get rid of an employee he regarded as a trouble maker, and one with whom he personally did not get along." *Id.* at 149. Although there is no less of a public interest in the provision of good quality care to the residents of a public facility for the retarded than in good care for patients in a hospital, we rejected the plaintiff's argument that the public policy exception to the at-will rule should extend to protect employees who were performing "appropriate, socially desirable duties" from being subject to discharge without cause. *Id.* at 150. We reasoned, "Essentially, the plaintiff's argument would require us to convert the general rule that 'an employment-at-will contract [can] be terminated at any time for any reason or for no reason at all,' see *Gram* v. *Liberty Mut. Ins. Co.*, [384 Mass. 659,] 668 n.6 [1981], into a rule that requires just cause to terminate an at-will employee. The public policy exception to the at-will employment rule is not that broad" (footnote omitted). *Id.* We conclude in this case, as

we did in *Smith-Pfeffer*, that the evidence did not warrant a verdict for the plaintiff.

We turn to the case against the defendant hospital administrator, Russo. "In an action for intentional interference with contractual relations, the plaintiff must prove that: (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *G.S. Enters., Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991), citing *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811, 812-817 (1990). Even if the evidence would have warranted a finding that Russo fired Wright in retaliation for her having complained to the survey team, a matter we are not deciding, that evidence alone would not have warranted a finding of improper motive, because, as we have held, the corporation had a right to discharge Wright for such a reason. As Wright's supervisor, Russo had a right to fire Wright unless he did so "malevolently, i.e., for a spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Sereni* v. *Star Sportswear Mfg. Corp.*, 24 Mass. App. Ct. 428, 432-433 (1987). The record is devoid of evidence that Russo's purpose in discharging Wright was unrelated to a legitimate corporate interest. We conclude that the evidence was insufficient to warrant a verdict against the defendant Russo.

We reverse the judgments for the plaintiff and remand to the Superior Court for the entry of judgments for the defendants.

*So ordered.*

LIACOS, C.J. (dissenting). I disagree with the court's conclusion that a hospital employer violates no public policy when it fires an employee for alerting supervisors to matters detracting from good patient care. The court has construed

far too narrowly the public policy exception to the doctrine of employment at will. Moreover, in demanding a statutory basis for public policy, the court has relinquished to the Legislature its role in shaping the common law. I dissent.

It is well-established that "an at-will employee has a cause of action for wrongful discharge if the discharge is contrary to public policy." *DeRose* v. *Putnam Management Co.*, 398 Mass. 205, 210 (1986).[1] We have perceived clear violations of public policy when an employer terminates an employee for: (1) asserting a legal right, see *Smith-Pfeffer* v. *Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 149 (1989) (citing example of filing a workers' compensation claim); (2) doing what the law requires, see *Hobson* v. *McLean Hosp. Corp.*, 402 Mass. 413, 416 (1988) (enforcing safety laws); and (3) refusing to do what the law forbids, see *DeRose, supra* at 210 (giving false testimony at trial). In addition, we have established "legal redress in certain circumstances for employees terminated for performing important public deeds, even though the law does not absolutely require the performance of such a deed." *Flesner* v. *Technical Communications Corp.*, 410 Mass. 805, 810-811 (1991) (cooperating with ongoing government investigation).

---

[1] A majority of other States have adopted the public policy exception. See, e.g., *Foley* v. *Interactive Data Corp.*, 47 Cal. 3d 654, 665 (1988); *Palmateer* v. *International Harvester Co.*, 85 Ill. 2d 124, 128 (1981); *Pierce* v. *Ortho Pharmaceutical Corp.*, 84 N.J. 58, 71 (1980). But see *Murphy* v. *American Home Prods. Corp.*, 58 N.Y.2d 293, 300-302 (1983) (rejecting the public policy exception).

In addition to the public policy exception, we have developed another exception to the employment-at-will doctrine. Employment contracts contain an implied covenant of good faith and fair dealing, which limits the conditions under which employment may be terminated. See *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 102 (1977). We have limited the application of this exception to cases in which an employer fires an employee and thereby deprives him or her of bonuses, commissions, or wages. See *id.*; *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659 (1981). As the plaintiff here "does not claim that she was terminated to avoid paying her expected future compensation or expected benefits . . . [*Fortune* and *Gram*] are inapplicable." *Smith-Pfeffer* v. *Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 150 n.4 (1989).

"[T]he Achilles heel of the [public policy exception] lies in the definition of public policy." *Palmateer* v. *International Harvester Co.*, 85 Ill. 2d 124, 130 (1981). It is a proper role of the courts to construe the boundaries of "public policy" and thereby develop common law remedies available to at-will employees who are terminated. Cf. *Schofield* v. *Merrill*, 386 Mass. 244, 245, 247-248 (1982) (based on social values and customs, and lack of community consensus, court refused to abolish "common law rule that a landowner is not liable to an adult trespasser for injuries resulting from the land-owner's negligence"). I find it disturbing, therefore, that the court would relinquish this role, by requiring a statutory basis for public policy. The court reads *Flesner* too narrowly. In that case, we provided relief because the plaintiff was fired for performing an important public deed, not because the plaintiff was acting in accordance with a legislatively deter-mined public policy. The court also declines to say whether public policy arises from such nonstatutory sources as regula-tions or the ethical codes of private professional organiza-tions. It thus defers unduly to the Legislature in defining the contours of the public policy exception. This deferral in the realm of common law is inappropriate. The court must deter-mine the boundaries of public policy, by looking not only to statutory law, but also to administrative law, judicial opin-ions, and even professional codes of conduct (where those codes serve a public interest, not merely the interests of the profession). See *Pierce* v. *Ortho Pharmaceutical Corp.*, 84 N.J. 58, 72 (1980).

In the instant case, the court should begin by acknowledg-ing the undisputable public interest in the provision of good medical care by hospitals. We have long recognized that hos-pitals "conduct enterprises greatly affected with a general public interest." *Springfield Hosp.* v. *Commissioner of Pub. Welfare*, 350 Mass. 704, 709 (1966). The Legislature clearly shares our concern with patient care.[2] In general, hospitals

---

[2]The court states that there is no statutory basis for the public policy allegedly violated by the defendant. It has reviewed only those statutes

are heavily regulated. See, e.g., G. L. c. 111, § 51 (1990 ed.) (requirement of license from Department of Public Health). Hospitals must have provisions in their by-laws "for reporting conduct by a health care provider that . . . might be inconsistent with or harmful to good patient care or safety." G. L. c. 111, § 203 (*a*) (1990 ed.). Under G. L. c. 111, § 70E (1990 ed.), patients possess a multitude of rights — for example, the right to reasonably prompt responses to requests, to background data on their physicians and the hospital, to information on their treatment, and in some cases, on all alternative treatments —that promote good care by empowering patients. Collective bargaining between health care facilities and their nursing and nonprofessional employees is also subject to statutory control, "in the interests of preserving the continuity and improving the quality of health care within the commonwealth." G. L. c. 150A, § 1 (1990 ed.). In addition, many administrative rules and regulations are concerned with the provision of good patient care. See, e.g., 244 Code Mass. Regs. § 3.02 (3) (f) (1986) (requirement of Board of Registration in Nursing that nurses "collaborate, communicate and cooperate as appropriate with other health care providers to ensure quality and continuity of care").

Given the public interest in good patient care, it must be the public policy of the Commonwealth to protect, if not encourage, hospital employees who perceive and report detriments to patient care. Only when problems are identified can they be adequately addressed; an employee's failure to report perceived detriments to patient care may allow the problems to persist. A hospital employer therefore violates public policy when it fires an employee for trying to improve the quality of patient care. Cf. *Hobson, supra* at 416 (violation of public policy to terminate employee for enforcing law). That an employer may deter other employees from reporting

requiring nurses and others to report cases of abuse and neglect, whereas I refer to a broader range of statutes reflecting a concern over the quality of patient care.

problems (for fear of losing their jobs) inhibits the provision of good patient care and offends the public interest.

The plaintiff was terminated for reporting problems affecting patient care to a private, national, supervisory organization.[3] According to her, these problems were causing lowered morale among nurses and conflicts between physicians and nurses, which in turn affected the quality of patient care.[4] As the plaintiff's comments concerned issues affecting patient care, the case does not involve a matter internal to the hospital over which the public has no concern. See *Mello* v. *Stop & Shop Cos.*, 402 Mass. 555, 560-561 (1988). Furthermore, unlike the situation in *Smith-Pfeffer, supra* at 151, the plaintiff raised concerns over employee relationships, not over hospital policy. The plaintiff was not terminated for contributing to the hospital's problems, nor for refusing to accept her supervisor's method of addressing the problems; she was fired for reporting the problems to appropriate accreditation authorities. Such a termination offends the public interest and is actionable. I dissent.

---

[3]The court does not address the defendants' contention that there was insufficient evidence to support a jury finding of termination in retaliation for critical comments. A review of the evidence in the light most favorable to the plaintiff, see *ante* at 470, reveals the following: The plaintiff received excellent evaluations; her supervisor was upset when he learned that a survey team would visit the hospital, and he questioned whether the plaintiff had instigated the visit; the plaintiff criticized the hospital to the survey team, and her statements were made known to the defendant; the supervisor made a comment suggesting that the hospital would terminate the employment of those who made criticisms, and he admitted that the comment might have referred to the plaintiff; the supervisor refused to talk to the plaintiff after he learned of her statements and refused to acknowledge her presence. Based on this evidence, the jury clearly were warranted in concluding that the plaintiff's termination was due to her critical comments.

[4]The problems did not have to amount to abuse or neglect of patients in order to raise an issue of public concern.