Cratsley, J.
Plaintiff, Millar Elevator Service Co. (“Millar”), commenced this action against defendant, Christos Liatsis (“Liatsis”), asking for equitable replevin (Count I), monetary damages (Count II), and injunctive relief (Count III). Liatsis filed counterclaims against Millar alleging intentional interference with contractual relations (Counterclaim I), intentional interference with advantageous relations (Counterclaim II), intentional infliction of emotional distress (Counterclaim III), and defamation (Counterclaim IV). Millar now moves for summary judgment on all of Liatsis’s counterclaims, asserting that Liatsis has failed to offer sufficient evidence to sustain any of his counterclaims. For the reasons discussed below, Millar’s motion for summary judgment is ALLOWED.
BACKGROUND
These facts are taken from the summary judgment record, which consists of affidavits, deposition transcripts, and business correspondence.
In August 1994 Millar entered into a contract with the Massachusetts Bay Transportation Authority (“MBTA”) to maintain the elevators and escalator equipment located throughout the MBTA subway system. In connection with the contract Millar kept a logbook (“log”) of repair work performed on the MBTA’s elevator and escalator equipment from late 1994 through August 3, 1998. The log contained information used by Millar in the performance of its contract with the MBTA, and was used as a reference for ongoing maintenance and repairs for which Millar was responsible under this contract.
William Hay (“Hay”), the supervisor of the MBTA/Millar contract from 1995 to 1997, began entering information into the log intended to assist Millar mechanics, such as escalator handrail lengths and equipment identification numbers. The log was also used to inventory tools, keep track of escalator and elevator units, record the step counts of the various escalators, and to record information about overhauls and repairs made to MBTA equipment on a quarterly basis in order to control the contract budget.
Donald Williams (“Williams”), the Millar supervisor who replaced Hay on the MBTA contract, also understood that the information contained in the log was solely and exclusively used for Millar employees and MBTA representatives. Under Williams’ supervision, Millar shared certain information from the log with the MBTA, including dates that the MBTA equipment was upgraded, identification numbers assigned to the equipment upgraded, identification numbers assigned to the equipment by the state and by the MBTA, and the manufacturer of the equipment. In 1997, Williams began recording information pertaining to major repairs made on MBTA equipment so that this information would be available to him when it came time to re-bid the MBTA contract.
On August 3, 1998, Williams noticed that a number of pages were missing from the log. On August 4, 1998, he questioned three Millar employees about the missing pages. Liatsis, one of the three employees questioned, admitted to removing pages from the log.[1] (Liatsis Dep., 11/10/99, at 107.)
On August 14, 1998, at approximately 6:00 a.m., Liatsis informed Williams that he was resigning from Millar. Liatsis resigned because he had been appointed as an Elevator Inspector for the Commonwealth of Massachusetts Department of Public Safety (“DPS”). At approximately 8:30 a.m., Liatsis met with Williams and two other representatives from Millar, and a business representative from the International Union of Elevator Constructors, Local 4. At that meeting, Liatsis again admitted that he removed a number of pages from the log. Id. at 119. The Millar representatives asked Liatsis to return the missing pages, but Liatsis informed them he no longer had them. To date, Liatsis has not returned the pages. Millar terminated Liatsis’s employment at that meeting.
On or about August 14, 1998, George Dahlquist (“Dahlquist”), an Elevator Inspector for the DPS, was performing state testing at the Alewife MBTA station. He approached Williams to inquire as to how Millar had dealt with Liatsis’s removal of pages from the log. Williams responded that Millar had terminated Liatsis’s employment.
On or about August 26, 1996, Donald Williams received a phone call from Mark Mooney (“Mooney”), the Assistant Chief of Inspection for DPS.[2] During that phone call, Mooney asked Williams if Millar had fired Liatsis and, if so, the reason for his termination. Williams responded that Millar had terminated Liatsis either because “he damaged company property and stole some merchandise from our logbook,” or “be *560 cause he stole something.” Williams only responded to questions initiated by Mooney.
Later, Mooney called Williams again and spoke with his assistant, Sheila Williams. Mooney asked Sheila Williams whether Millar had a letter relating to Liatsis’s termination and if he could have a copy of it. Sheila Williams related Mooney’s request to Williams, who told her to send Mooney a copy of the correspondence dated August 17, 1998, which was addressed to Liatsis and confirmed his termination from Millar.
As a result of the information communicated by Williams regarding Liatsis’s termination from Millar, the DPS withdrew its offer to erhploy Liatsis as an Elevator Inspector. (Letter from DPS to Liatsis of 8/26/98.)
Liatsis maintains that, after his termination from Millar, he suffered from high blood pressure, stress, and anxiety. He believes these health problems are related to his termination. Liatsis concedes that he was also treated for high blood pressure prior to his termination from Millar. (Liatsis Dep. at 155-56.) Liatsis also states that he suffered from depression after his termination from Millar.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983); MassR.Civ.P. 56(c). Where “in essence there is no real dispute as to the salient facts or if only a question of law is involved,” summary judgment shall be granted to the party entitled to judgment as a matter of law. Cassesso, 390 Mass. at 422. The moving party may show lack of a triable issue either by submitting affirmative evidence negating an essential element of the opponent’s case or by demonstrating that proof of that essential element is unlikely to be forthcoming at trial. Kourouvacilis, 401 Mass. at 716 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a material fact in order to defeat the motion. Pederson v. Time, 404 Mass. 14, 16-17 (1989).
A. Intentional Interference with Contractual Relations
Liatsis argues that Millar intentionally interfered with his contractual relationship with the DPS. In order to sustain a claim for intentional interference with contractual relations, Liatsis must show: “(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions.” Wright v. Shriners Hospital for Crippled Children, 412 Mass. 469, 476 (1992) (quoting G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991)). To determine whether conduct that interferes with the contractual relations of a plaintiff and a third party is improper, it is necessary to consider whether the conduct arose from an improper motive or the use of improper means. See United States Trucking Corp. v. Geltman, 406 Mass. 811, 816-17 (1990).
Here, Liatsis claims that Millar or its representatives had improper communications with the DPS which induced it to withdraw from its employment agreement with him. His claim stems from two separate contacts between Williams and Mooney and one conversation between Williams and Dahlquist. All three communications occurred after Liatsis’s termination from Millar and none were initiated by Millar, although this is disputed by Liatsis. However, as this Court finds that all of the communications between Williams and the DPS were proper, it is irrelevant which party initiated the contacts.
The first communication regarding Liatsis’s termination from Millar involved Williams and Dahlquist, a DPS Elevator Inspector. Dahlquist was at the Alewife MBTA at the time of Liatsis’s termination, and asked Williams what happened regarding Liatsis removing pages from the log. Williams simply told Dahlquist that Millar terminated Liatsis’s employment, and did not offer any additional information.
The second communication occurred when Mooney, a representative of the DPS, telephoned Williams to ask if Liatsis had been terminated from Millar and the reasons surrounding the termination. Williams told Mooney that Liatsis was terminated because he stole from Millar. In this conversation, Williams merely answered Mooney’s questions, and did not volunteer any further information beyond the scope of the questions.
The last communication that occurred between Millar and the DPS involved a second telephone call from Mooney to Williams. Mooney spoke with Williams’ assistant and asked for a copy of Liatsis’s termination letter. After Williams’ assistant informed him of Mooney’s request, he told her to send Mooney a copy of the August 17, 1998 letter confirming Liatsis’s termination from Millar. Williams sent this letter in response to Mooney’s request regarding the employment history of a prospective employee.
This Court' finds and rules that Liatsis has not proffered sufficient evidence at this summary judgment stage to satisfy a claim for intentional interference with contractual relations. There is no evidence that Millar knowingly induced the DPS to withdraw its prospective relationship with Liatsis. Further, Liatsis has not offered evidence from which any inference can be drawn of an improper motive in the communications between Millar and the DPS. There is also no evidence to suggest that the information provided by Millar was given for any purpose other than to inform *561 a prospective employer of Millar’s experiences with a former employee, a motive which is proper as a matter of law. See Conway v. Smerling, 37 Mass.App.Ct. 1, 7-8 (1994). Finally, the information provided by Millar to the DPS was truthful and within the scope of requested information by the DPS, regardless of who initiated the conversations. Since Liatsis has failed to offer any evidence to sustain a claim for intentional interference with contractual relations, this claim must fail as a matter of law.
B.intentional Interference with Advantageous Relations
Liatsis also contends that the communications between Millar and the DPS concerning Millar’s termination of his employment interfered with his advantageous relations with the DPS. Like the tort of intentional interference with contractual relations, the interference with advantageous relations must be intentional and by unlawful means. See Conway, 37 Mass.App.Ct. at 7. In Conway, a former employee sued her former employee for the tort of intentional interference with advantageous relations. The plaintiffs previous employer informed an employment agency that was assisting her in locating a new job that he would not rehire her because the circumstances surrounding her departure were the subject of a police investigation. See id. The employee left her former job amid assertions by her employer that she had either diverted company inventory and sold it for her own profit or that she had assisted another employee in a similar venture. See id. at 2. In determining the validity of the employee’s claim, the appellate court focused its attention on whether the employer’s statement to the employment agency “sprang from an improper purpose.” Id. at 7. The Appeals Court found that the employer had reason to believe that the former employee had been engaged in illegal activity at the time the employment agency made its inquiiy and thus ruled that the employer “had a privilege, if not a duty, to speak the truth even if the disclosure of the facts might negatively affect the employee’s job prospects.” Id. at 7-8 (brackets omitted).
Like the employer in Conway, Millar responded to inquiries from a prospective employer, regardless of who initiated the telephone calls, and provided accurate information regarding Liatsis’s termination from Millar. From the evidence available in the summary judgment record, this Court concludes that Millar did not intend to interfere with Liatsis’s prospective employment with the DPS. Accordingly, there is insufficient evidence produced by Liatsis at this summary judgment stage that Millar interfered with Liatsis’s advantageous business relations with the DPS. Thus, this claim also fails as a matter of law.
C.Intentional Infliction of Emotional Distress
Liatsis claims that Millar’s communications with DPS that resulted in the loss of his position as an Elevator Inspector caused his severe depression. Liatsis argues that Millar’s conduct in reporting that he was terminated because he stole pages out of the log was extreme and outrageous.
In order to sustain a successful claim for intentional infliction of emotional distress a plaintiff must demonstrate that the defendant’s actions were intentional and “so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.” Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987) (citing Restatement (Second) of Torts §46, comment d (1965)). Moreover, although the tort of intentional infliction of emotional distress may apply when a plaintiff has not experienced any bodily harm, the Supreme Judicial Court has warned that “the door to recovery should be opened but narrowly and with due caution.” Agis v. Howard Johnson Co., 371 Mass. 140, 144 (1976) (quoting Barnett v. Collection Serv. Co., 214 Iowa 1303, 1312 (1932)).
Here, Millar’s responses to the questions by the DPS regarding Liatsis’s termination do not rise, as a matter of law, to the level of “extreme outrageousness” necessary to warrant recovery for intentional infliction of emotional distress. The summary judgment record confirms that Millar offered the DPS truthful information as to why it terminated Liatsis. There is also no evidence that Millar intended to cause harm to Liatsis by responding to the DPS’ inquiries. Because insufficient evidence exists to establish that Millar’s conduct was outrageous, the intentional infliction of emotional distress claim also must fail.
D.Defamation
Liatsis’s fourth claim is that Millar is liable for defamation as a result of the information Williams communicated to the DPS. Liatsis asserts that Williams falsely told Mooney that he stole pages from the log, and that Millar cannot raise privilege as a defense.
Under Massachusetts law, an absolute privilege constitutes a complete defense to a defamation claim even if the statement was made in bad faith or with malice. See Ezekiel v. Jones Motor Co., Inc., 374 Mass. 382, 385 (1978). When a defendant lacks an absolute privilege, a qualified privilege may provide a limited defense as long as the privilege is not abused. See id. A conditional or qualified privilege is typically raised in cases where information is sought from an employer as to the qualifications or character of a former employee. See Sheehan v. Tobin, 326 Mass. 185, 190 (1950). Statements made to a party inquiring about the employment of a prospective employee, absent abuse of the privilege, are protected by a qualified privilege. See id. Further, truth is an absolute defense in an action for defamation. See Bander v. Metropolitan Life Ins. Co., 313 Mass. 337, 342 (1943).
As previously discussed, Millar’s communications with the DPS were limited to responses to inquiries made regarding Liatsis’s termination from Millar. The *562 DPS was a prospective employer of Liatsis, and was inquiring about his character while working at Millar, his past employer. Thus, Millar had a qualified privilege to inform the- DPS that Liatsis had been terminated after he admitted, on two separate occasions, to removing pages from the log.
Finally, Liatsis argues that Millar lost or abused its qualified privilege because (1) Williams did not verify that the missing pages contained specific work product before publishing to the DPS that Liatsis stole from Millar, (2) the statements were published with actual malice, (3) the statements were published with ill will and/or an ulterior motive, and (4).the statements were published excessively. The Court will address each argument in turn.
In Mendez v. M.S. Walker, Inc., 26 Mass.App.Ct. 431 (1988), theAppeals Court held that the qualified privilege to disseminate a serious charge may be lost if the publisher of the statement either knows that the statement is false or has a reckless disregard for its truth. See Mendez at 433-34. In Mendez, the plaintiffs employer observed him placing a box used to hold store merchandise in the trunk of his car. See id. at 432. The employer then terminated the plaintiffs employment, and told other employees that the plaintiff stole merchandise. See id. The plaintiff claimed that he had merely taken an empty box and used it to store tools, and invited the employer to search his car to verify that this was the case. See id. at 434. However, the employer refused. See id. The Appeals Court found that “the evidence warranted a finding that broader dissemination of the charge against Mendez without an effort to verity its truth, in circumstances where verification was practical, amounted to a reckless disregard of Mendez’s rights and of the consequences that might result to him.” Id. at 433 (citation, quotations and brackets omitted).
Liatsis’s emphasis on Mendez is misplaced because the actions Liatsis admitted to on August 4, 1998 and August 14, 1998 can legally be described as “theft.” According to the American Heritage Dictionary, the definition for steal is “to take the property of another without right or permission.” The American Heritage Dictionary 1192 (2d College ed. 1985). A theft is defined as “the act of an instance of stealing.” Id. at 1260. The log belonged to Millar. Liatsis admitted that he removed pages and that he kept this information from Millar until it confronted him on his actions. This Court finds the use of the words “stolen” and “theft” appropriate in describing Liatsis’s conduct to others. Consequently, no greater duty was placed on Millar for further investigation or verification. Thus, this Court finds and rules that the statements made by Millar and its representatives were not only truthful, constituting an absolute privilege to defamation, but are also protected by Millar’s qualified privilege to communicate information about Liatsis to the DPS.
Liatsis next claims that the statements were made with actual malice and thus were not privileged. Liatsis asserts that an inference of malice may be drawn from the fact that Williams did not verify or investigate that Liatsis had actually stolen pages of value from the log. This Court has already found that Williams was under no duty to do so because the conduct which Liatsis admitted to can properly be described as theft. Thus, there is no merit to this assertion.
Liatsis further claims that Williams published the statement with ill will and an ulterior motive. He asserts that the harsh language used by Williams when he discovered that Liatsis stole the missing pages illustrates ill will. Liatsis also argues that Williams had an ulterior motive — he used Liatsis’s admission of removing the pages as an opportunity to remove additional pages himself to share with a Millar competitor for the purpose of obtaining a job with the competitor. This Court finds no merit to either of these contentions.
The fact that Williams was angry and used harsh language when he discovered Liatsis had stolen Millar property is insufficient, as a matter of law, to establish ill will. There is nothing improper in the fact that a supervisor would become angry upon learning that an employee had stolen company property.
This Court also finds no merit to Liatsis’s claim that Williams used Liatsis’s admission to “cover up” his own wrongdoing. The only evidence Liatsis submits to support this claim is that the log was in Williams’ sole control in the week following the discovery of the missing pages, and that Williams secured a position with a Millar competitor over a year after the log pages were discovered missing. There is nothing unusual in the fact that Williams, a supervisor at Millar, had exclusive control of the log during the investigation into the missing pages. This Court also finds that the fact that Williams left Millar to work for a competitor over a year after this incident, see Williams Dep., 11/30/99, at 146, is legally insufficient to support Liatsis’s allegations of wrongdoing.
Finally, this Court finds no merit to Liatsis’s assertion that informing the DPS on three occasions that Millar had terminated Liatsis, in response to inquiries made by the DPS, was unnecessary, unreasonable or excessive.
For the reasons discussed, this Court finds that Liatsis’s claim of defamation must fail as a matter of law.
ORDER
For the foregoing reasons, it is hereby ORDERED that Millar’s Motion for Summary Judgment on all of Liatsis’s counterclaims is ALLOWED.

The parties disagree as to the amount of pages missing from the log, as well as the content of those pages. However, this is of no consequence for the legal analysis found herein because the acts which Liatsis admits to doing are legally sufficient to be described as “theft.” See p. 11, infra.

The date of this telephone call, as well as who initiated it, are disputed, but ultimately irrelevant to this opinion.