Sanders, Janet L., J.
This is an action challenging the plaintiffs termination of his at-will employment from the consulting firm of Vitale, Caturano & Company, P.C. (“VCC”). The plaintiff David Dolph contends that the defendants VCC, John Carucci and Richard Caturano discharged him in violation of public policy (Count I) and in violation of the implied covenant of good faith and fair dealing (Count II). The plaintiff also alleges that Carucci and Caturano intentionally interfered with his contractual relations with VCC (Count III). The case is now before the Court on the Defendants’ Motion for Summary Judgment. For the following reasons, this Court concludes that the Motion must be Allowed.

FACTUAL BACKGROUND

The following facts are those which are material to this motion, and which are either undisputed or assumed by this Court to be true. The plaintiff David Dolph was hired to work at VCC in September 2002 as a senior accountant. For the three years before that, he worked in the audit department of Arthur Andersen, where he received favorable evaluations. In contrast to Arthur Andersen, which was a national accounting firm dealing with publicly traded companies, VCC is a Boston-based consulting firm which focuses on middle-market New England companies. The president of VCC is Richard Caturano. John Carucci is a VCC partner. While at VCC, Dolph worked on five audits. Although Dolph did not get the feedback on his work that he had been promised, neither were there any complaints about his performance. When Dolph applied to be licensed as a Certified Public Accountant in February 2003, two VCC partners wrote letters of support praising Dolph’s professionalism and abilities.
In October 2002, Dolph was assigned to an audit team for an engagement at Galaxy Tire & Wheel, Inc. (“Galaxy”). The audit was to cover Galaxy’s financial performance for the calendar year 2002. Carucci brought Galaxy to VCC from his former firm, where he had worked on Galaxy’s annual financial statements for the previous ten years. VCC’s Jean Robertson was designated as the manager on the Galaxy engagement. Robertson advised Dolph to be sensitive to “going concern” aspects in the upcoming audit: Robertson had looked at the company’s numbers throughout the year and noted that Galaxy had significant debt and was not making its budget. Before the audit actually began, however, Robertson left VCC, and was replaced by Julie MacKinnon as the audit’s manager.
In March 2003, fieldwork on the Galaxy audit commenced. Among other things, Dolph was responsible for assessing areas of increased risk within the company, which he did. He noted that the company’s 2002 sales volume had fallen below expectations; at the same time, the company was having difficulties with cash flow and with meeting its obligations under various financing agreements. Dolph’s concerns were underscored when he inadvertently received a copy of a memorandum from Galaxy’s President Brian Ganz (“the Ganz memorandum”) to the company’s employees which raised red flags about the company’s financial condition. In addition, Dolph became aware that Galaxy’s president was seeking to purchase a com *661 pany in Yugoslavia, a country which was politically and economically unstable.
One of the problems noted in the Ganz memorandum was that the company was having an inventory problem. Dolph’s investigation confirmed that. The inventory balance was considerable, but the inventory reserve — the amount of money which must be set aside to cover inventory that could not be sold — was extremely modest: $89,500. That the inventory was “under-reserved” affected Galaxy’s ability (in Dolph’s view) to continue as a “going concern.” If Galaxy had to increase its inventory reserve, however, that would constitute an expense which would in turn reduce or eliminate any net profit for 2002 appearing on Galaxy’s “Profit & Loss” Statements. Galaxy had a $9.6 million line of credit with Citizen’s Bank which was coming up for renewal in June 2003. Any expenses or adjustments made to Galaxy’s Profit & Loss Statements could imperil that application for renewal and would not go unnoticed by the suppliers and vendors who would be receiving the financial statements that VCC prepared.
As Dolph was working on the inventory reserve issue, Galaxy’s Controller, Linda Mitchell, informed him that she and Carucci had already agreed that the inventory reserve amount for 2002 would not be changed and would remain at $89,500. Convinced that the amount fell far short of adequate, Dolph discussed his concerns with his supervisor MacK-innon. He informed MacKinnon that his inventory analysis indicated that the inventory reserve needed to be increased by at least $257,000 and perhaps as much as $406,000. MacKinnon complimented Dolph on his inventory analysis and concurred with his concerns about Galaxy.
On March 18, 2003, Carucci came to the Galaxy facility and reviewed Dolph’s work. He too complimented Dolph on his inventory reserve analysis. Galaxy’s Controller Mitchell, however, complained to Carucci that Dolph was spending too much time on Galaxy’s inventory.
Four days later, Carucci sent an e-mail to VCC’s Human Resources Director, with copies to the VCC partners. In the e-mail, he listed what he described as “grapevine grumblings” about Dolph that he had heard since January 2003. The e-mail did not specifically refer to Dolph’s work on Galaxy. Rather, it talked in more general terms, stating that Dolph was “lazy,” “thin on knowledge,” and “not functioning at the senior level, or even at entry level.” It recommended that Dolph be terminated as soon as possible.
On March 25,2003, Carucci met directly with Brian Ganz, Galaxy’s president. Three days later, Carucci met with Dolph and MacKinnon about the Galaxy audit. Carucci told Dolph that there would be no changes made in the amount allocated for inventory reserve. He also made it clear that he did not see any need for there to be a “going concern” evaluation done on Galaxy, even though Dolph believed that the “under reserve” in inventory affected Galaxy’s ability to continue in operation.
Immediately after the meeting, Dolph expressed his concerns to other VCC members of the audit team and showed them the Ganz memorandum. They agreed that there were going concern issues that needed to be investigated. At the instructions of MacKinnon, Dolph took the memorandum to Carucci’s office that same day but Carucci was not there. On March 31, Dolph delivered the Ganz memorandum to Carucci. Three hours later, Dolph was notified that he was being terminated. Following Dolph’s termination and as part of the audit of Galaxy, a “going concern checklist” was prepared. The one condition identified by the checklist which could affect Galaxy’s ability to continue as a business in the next twelve months was its plan to renew its line of credit with Citizen’s Bank. Because the bank and Galaxy had a long standing relationship and the bank had customarily extended the line of credit in the past, it was determined that the auditor’s report did not require a separate explanatory paragraph dealing with any “going concern” issues. No increase was made to the inventory reserves. Galaxy remains a viable business today.

DISCUSSION

Although the Complaint contains three counts, they all rest on the same core theory. In essence, the plaintiff maintains that the decision to fire him was because he had insisted on complying with accounting standards applicable to his profession in connection with the Galaxy audit.[1] These standards, it is contended, embody a public policy which justify the imposition of liability on an employer who terminates the at-will employee attempting to adhere to them. The accounting rules upon which the plaintiff relies, however, are too amorphous to constitute the kind of well-defined public policy which the case law requires in this area, necessarily implicating judgment calls best left to those within the accounting firm itself. At best, Dolph and his superiors disagreed as to whether there was a significant inventory “under reserve” at Galaxy which jeopardized the future of the company. Dolph was neither being asked to do something which was clearly unlawful nor was he being penalized because he refused to break the law.
This Court begins its analysis with the general rule that an at-will employee (like the plaintiff) may be terminated for almost any reason or for no reason at all. Jackson v. Action for Boston Community Development Inc., 403 Mass. 8, 9 (1988). One exception to that rule is where the termination is contrary to a well defined public policy. DeRose v. Putnam Management Co., Inc., 398 Mass. 205 (1986). “Redress is available for employees who are terminated for asserting a legally guaranteed right (e.g. filing a workers’ compensation claim), for doing what the law requires (e.g. serving on a jury) or for refusing to do that which the *662 law forbids (e.g. committing perjury.” Smith-Pfeffer v. Superintendent of Walter E. Fernald School, 404 Mass. 145, 149-50 (1989). Whether a clearly defined public policy exists sufficient to permit such redress is a question of law appropriately decided on summary judgment. Flynn v. City of Boston, 59 Mass.App.Ct. 490 (2003) (affirming summary judgment on grounds that no public policy implicated).
Courts have consistently interpreted the public policy exception narrowly, since to do otherwise would convert the general rule permitting the discharge of an at-will employee into one which required just cause for termination. It is not enough, therefore, that the plaintiff was performing an appropriate or even a socially desirable act. Public safety — or an issue of such public importance that the legislature has recognized it as such — must be at stake. Thus, for example, in Mistishen v Flacone Piano Co., 36 Mass.App.Ct. 243 (1994), the plaintiff could not recover where she had been terminated after she complained that her employer was not being truthful about the poor quality of pianos it sold. Similarly, in Smith Pfeffer v. Superintendent of Walter E. Fernald State School, 404 Mass. 145 (1989), the Supreme Judicial Court found nothing unlawful about the plaintiffs discharge after she criticized the school superintendent about his administrative abilities and opposed his reorganization plan. Although she maintained that her employer’s actions ultimately put at risk the well being of the mentally retarded residents at the school, the Supreme Judicial Court held that such “internal matters” involved the judgment of those entrusted with making decisions within the institution and could not be the basis for the public policy exception to the at-will rule. The Court reached a similar result in Mello v. Stop & Shop Cos., 402 Mass. 555 (1988), where it refused to extend protection to a pláintiff who had been terminated after he called to the employer’s attention the fact that false claims were being made by store managers within the company. And in King v. Driscoll, 418 Mass. 576 (1994), the SJC held that there was no public policy which would prevent an employer from terminating an employee who joins in a shareholder derivative action, even though he had, as a shareholder of the employer corporation, a statutory right to participate.
Particularly instructive to this Court in deciding the instant case is Wright v. Shriner’s Hospital for Crippled Children, 412 Mass. 469 (1992), where the SJC overturned a jury verdict for the plaintiff who had been discharged after she had been critical of her hospital employer in an internal survey regarding patient care. In finding that a public policy was implicated, the trial judge had relied on the obligations of a nurse, set forth in a code of ethics and in nursing regulations, to ensure quality patient care. The SJC disagreed, noting that “we have never held that a regulation governing a particular profession is a source of a well defined public policy sufficient to modify the general at-will employment rule.” 412 Mass. at 474. The plaintiffs motives might be laudable and her actions even socially desirable, but ultimately the matter was internal to the hospital. The Court recognized that there is a public interest in the provision of good medical care. “It does not follow, however, that all health care employees should be immune from the general at-will employment rule simply because they claim to be reporting on issues that they feel are detrimental to health care.” 412 Mass. at 475.
The case before this Court is remarkably similar to Wright, supra. Like the plaintiff in Wright, Dolph relies on certain ethical standards and regulations applicable to his profession. First, he cites a regulation, promulgated by the Board of Public Accountancy, which requires that an accountant “shall not knowingly misrepresent facts, and when engaged in the practice of public accounting . . . shall not subordinate his or her judgment to others.” 252 C.M.R. 3.01(2). Second, he relies on that regulation which requires that an accountant sign a financial statement only if he has complied with “applicable generally accepted auditing standards.” 252 C.M.R. 3.02(2). The auditing standards referenced by the regulation are promulgated by the American Institute of Certified Public Accountants. Section 341.02 of those standards states that “the auditor has the responsibility to evaluate whether there is substantial doubt about the entity’s ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited . . .” Dolph claims that his insistence that there was an inventory reserve problem necessarily implicated these regulations, since the inventory issue raised questions about Galaxy’s ability to continue in business. Because he was doing only what the standards of his profession require (he argues), his termination constitutes a violation of public policy.
As in Wright, however, this Court declines to hold that these regulations create a public policy sufficient to diverge from the general rule allowing termination of an at-will employee. Indeed, how these regulations play out in the context of an audit raises questions best answered by professionals within the accounting firm itself. Whether an inventory reserve must be increased, for example, and whether it is required that the audit statement include a “going concern” opinion seem more to be matters of accounting judgment: the auditing standards state only that an auditor should “evaluate” a company’s ability to continue doing business in the event that there is “substantial doubt,” without saying what that evaluation should entail. Moreover, it is difficult to discern the public interest at stake here: Galaxy is a privately held company and, although its lenders and suppliers would rely on the financial statements that VCC prepared, there is nothing in the record before this Court to suggest that VCC was insisting (over Dolph’s objections) to misrepresent any material facts in those financial statements. In any event, even acknowledging that there is a general *663 public interest in accurate financial statements, it does not follow that an accountant like Dolph should be immune from the general at-will employment rule simply because he claims to have that interest at heart.
Having concluded that there is no clearly defined public policy at stake in the instant case, this Court further concludes that summary judgment in defendants’ favor as to all counts in the Complaint is appropriate. Both Counts I and II rely on the public policy exception to the at-will employment rule.[2] Although Count' III is somewhat different in that it alleges intentional interference with contractual relations, that count can survive summary judgment only if there is evidence that the individual defendants (Carucci and Caturano) had an improper motive in terminating the plaintiff or acted with actual malice. The only “improper” motive raised by the plaintiff is his claim that Carucci and Caturano recommended or approved his discharge because Dolph was insisting on complying with certain accounting rules. Because this Court has already concluded that this would not violate any well established public policy, it necessarily follows that this alleged motive is not improper. Apart from that, there is no evidence that the defendants discharged plaintiff “malevolently, i.e. for a spiteful malignant purpose, unrelated to the legitimate corporate interest.” Sereni v. Star Sportswear Manufacturing Corp., 24 Mass.App.Ct. 428, 432-33 (1987). Without such evidence, the plaintiff has no reasonable expectation of prevailing on Count III.

CONCLUSION AND ORDER

For all the foregoing reasons, the defendants’ Motion for Summary Judgment on Counts I, II, and III is ALLOWED. It is hereby ORDERED that the Complaint be DISMISSED, with prejudice.

Defendants deny any causal connection between Dolph’s termination and the positions that he took on the Galaxy audit. To avoid any claim that there is a triable issue as to the reason for his discharge, this Court accepts Dolph’s version of events as true for purposes of this Motion.

Although Count II states that the defendants breached the covenant of good faith and fair dealing, the sole basis for this assertion is the plaintiffs claim that he was terminated in violation of public policy. There is no claim being made under Fortune v. National Cash Register Co., 373 Mass. 96, 102 (1977), and its progeny, since Dolph received all the compensation that he was due upon his discharge.